474 F.2d 134
 5 Fair Empl.Prac.Cas. 613, 5 Empl. Prac. Dec. P 8470
Joseph P. MOODY et al., Appellants,
v.
ALBEMARLE PAPER COMPANY, a Virginia corporation et al.,
Appellees. Equal Employment Opportunity
Commission, Amicus Curiae.
 No. 72-1267.
 United States Court of Appeals,
Fourth Circuit.
 Argued Oct. 3, 1972.
Decided Feb. 20, 1973.
 
 George Cooper, New York City, and Robert Belton, Charlotte, N. C. (J. LeVonne Chambers, Chambers, Stein, Ferguson & Lanning, Charlotte, N. C., T. T. Clayton, Clayton & Ballance, Warrenton, N. C., Conrad O. Pearson, Durham, N. C., Jack Greenberg, William L. Robinson, Morris J. Baller, Eric C. Schnapper, New York City, on brief), for appellants.
 Leonard Appel, Washington, D. C., (Warren Woods, Betty Southard Murphy, Wilson, Woods & Villalon, Washington, D. C., and James B. Ledford, Charlotte, N. C., on brief), for appellee, Halifax Local No. 425, United Papermakers and Paperworkers, AFL-CIO.
 Francis V. Lowden, Jr., Richmond, Va. (Paul M. Thompson, Hunton, Williams, Gay & Gibson, Richmond, Va., Gordon G. Busdicker, Faegre & Benson, Minneapolis, Minn., Julian R. Allsbrook, Allsbrook, Benton, Knott, Allsbrook & Cranford, Roanoke Rapids, N. C., Charles F. Blanchard, and Yarborough, Blanchard, Tucker & Denson, Raleigh, N. C., on brief), for appellees, Albemarle Paper Co. and others.
 Martin Slate, Atty., E. E. O. C. (John De J. Pemberton, Jr., Acting Gen. Counsel, Julia P. Cooper, Chief, Appellate Section, E. E. O. C., on brief), for amicus curiae, E. E. O. C.
 Before BOREMAN and BRYAN, Senior Circuit Judges, and CRAVEN, Circuit Judge.
 CRAVEN, Circuit Judge:
 
 
 1
 This is a class action arising under Title VII of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e et seq. Plaintiffs are representative members of the class composed of all Negroes employed at defendant's Roanoke Rapids plant and all Negroes who may hereafter apply for employment at the Roanoke Rapids plant. The multitude of defendants is occasioned by changes in corporate ownership which occurred subsequent to the institution of the action. Since the Roanoke Rapids operation has at all pertinent times been called the Albemarle Paper Company, the corporate defendants will hereinafter be referred to as Albemarle.
 
 
 2
 The district court found that Albemarle practiced racially disciminatory employment practices prior to July 2, 1965, and that the effect of that discrimination had been perpetuated through a job seniority system. Thus, the district court enjoined Albemarle and the defendant union, Halifax Local 425, United Papermakers and Paperworkers, AFL-CIO, from discriminating against Negro employees, and ordered that the job seniority system be abolished and a plant-wide seniority system be implemented. There has been no appeal from these provisions of the court's decree.
 
 
 3
 The district court refused to order the abolition of or changes in the pre-employment testing procedures used by Albemarle. Plaintiffs appeal from the district court's determination. Judge Boreman concurs with Judge Craven in reversing and remanding to the district court on this issue. Judge Bryan dissents.
 
 
 4
 The district court also refused to award the plaintiffs back pay. Judge Bryan concurs with Judge Craven in reversing the district court on this issue. Judge Boreman dissents.
 
 
 5
 The effect of this division in the court is to reverse and remand the district court's determination as to the testing procedures and the refusal to award back pay.
 
 
 6
 * TESTING PROCEDURES
 
 
 7
 Prior to 1958, no employment personnel tests were given to applicants for employment at Albemarle. In 1956, the personnel manager was requested to design a screening program for selection of employees for certain departments. In this connection, the Revised Beta Examination (Beta) and the Bennett Mechanical Comprehension were selected to test applicants. A brief study was made at that time to determine the usefulness of the Beta test.
 
 
 8
 About 1963, the then personnel manager discontinued using the Bennett Mechanical Test since it had not been studied. Use of the Wonderlic Test, A and B series, was initiated at that time. Whereas the Beta is a non-verbal test developed to measure the intelligence of illiterate and non-English speaking individuals, the Wonderlic Tests are verbal tests of general mental ability. Use of the Wonderlic Tests was adopted in connection with the Beta because Albemarle felt it essential for new employees to have a certain level of verbal facility because of the increasing technical nature of the operation and the increasing use of printed instructions in the operation of machinery and the like.
 
 
 9
 The operations of Albemarle are, like other pulp and paper mills, organized on a departmental basis. For purposes of employee classification and promotion, each department is organized into one or more lines of progression. Entrance into each department is effected at the bottom of a line of progression and employees move up, depending on their ability and experience, as vacancies occur. In all, Albemarle has 11 separate departments containing 17 lines of progression. Since 1963, applicants for 8 of these departments and 14 of the lines of progression were required to score successfully on the Beta and Wonderlic pre-employment tests.
 
 
 10
 After the Supreme Court decision in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), Albemarle hired an expert in industrial psychology and testing to conduct a validation study of its pre-employment testing procedures. A validation study determines whether test results have a significant relationship to actual performance on the job. The technique adopted for the validation study of Albemarle's tests was concurrent validation. In concurrent validation, a sample of current employees occupying the jobs, or job groups, in question is selected. These employees are then given the tests, and the test scores compared with one or more criteria of the employees' ability to perform their jobs.
 
 
 11
 Albemarle's validation study covered 10 job groups in only 8 of the 14 lines of progression, and 5 of the 8 departments for which the tests are required. The sample of employees was generally selected from the higher level jobs and encompassed approximately 30 percent of the different jobs for which tests are required. The test scores from that sample were compared with two supervisors' comparative ratings of employees in each job slot. The criteria for the supervisors' ratings was: "Excluding a man's attitude, just how well the guy can do the job when he's feeling right." (A. 471). No job analysis was done for the jobs in question.
 
 
 12
 Albemarle's expert found that one of the tests was validated for 9 of the 10 job groups studied. However, both tests were valid for only one job group.
 
 
 13
 The effect of the district court's approval of Abemarle's testing procedure is to approve a validation study done without job analysis, to allow Albemarle to require tests for 6 lines of progression where there has been no validation study at all, and to allow Albemarle to require a person to pass two tests for entrance into 7 lines of progression when only one of those tests was validated for that line of progression. We think this was error.
 
 
 14
 Title VII of the Civil Rights Act "proscribes not only overt discrimination but also practices that are fair in form, but discriminatory in operation." Griggs v. Duke Power Co., 401 U.S. 424, 431, 91 S.Ct. 849, 853, 28 L.Ed.2d 158 (1971). If an employment practice, though facially neutral as the testing procedures here, is shown to have a differential impact on minority employment, it is prohibited unless the employer can prove business necessity. Griggs, at 432, 91 S.Ct. 849. The plaintiffs made a sufficient showing below that Albemarle's testing procedures have a racial impact.[1] It was thus incumbent upon Albemarle to establish business necessity[2] by showing that its testing requirements "have a manifest relationship to the employment in question." Griggs, at 432, 91 S.Ct. at 854. United States v. Jacksonville Terminal Co., 451 F.2d 418, 455-457 (5th Cir. 1971).
 
 
 15
 While Sec. 703(a)(2), (h)[3] specifically authorizes professionally developed tests not used to discriminate, Griggs makes clear that that section allows only those tests proven to be job related. 401 U.S. at 436, 91 S.Ct. 849. In so holding, the Court gave great deference to the interpretation of the Act evinced in a set of guidelines by the enforcing agency, the Equal Employment Opportunity Commission. Griggs, at 433-434, 91 S.Ct. 849. We have also recently noted with approval these guidelines. Robinson v. Lorillard Corp., 444 F.2d 791, 798 n. 7 (4th Cir. 1971).
 
 
 16
 We think Albemarle has failed in several respects to show that its tests are job related, have a manifest relationship to employment, and have been validated in accordance with EEOC guidelines.
 
 
 17
 In developing criteria of job performance by which to ascertain the validity of its tests, Albemarle failed to engage in any job analysis. Instead, test results were compared with possibly subjective ratings of supervisors who were given a vague standard by which to judge job performance. Other courts have expressed skepticism about the value of such ill-defined supervisor appraisals. See, e. g., Rowe v. General Motors Corp., 457 F.2d 348, 452 (5th Cir. 1972). Also Cooper and Sobol have stated in their article, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1662 (1969):
 
 
 18
 Supervisory ratings, for example, which are possibly the single most common performance measure used in validity studies, are subject to personal prejudice. When test scores are correlated with such ratings, the validation, if it can be called that, is of questionable value and may simply prove that the test has the same bias as the supervisors.
 
 
 19
 Likewise, in this regard the EEOC guidelines provide:
 
 
 20
 (3) The work behaviors or other criteria of employee adequacy which the test is intended to predict or identify must be fully described; and, additionally, in the case of rating techniques the appraisal form(s) and instructions to the rater(s) must be included as part of the validation evidence. Such criteria may include measures other than actual work proficiency such as training time, supervisory ratings, regularity of attendance and tenure. Whatever criteria are used they must represent major or critical work behaviors as revealed by careful job analyses.
 
 
 21
 (4) In view of the possibility of bias inherent in subjective evaluation, supervisory rating techniques should be carefully developed, and the ratings should be closely examined for evidence of bias.
 
 
 
 * * *
 
 
 [29]
 C.F.R. Sec. 1607.5(b) (1970)
 We agree that some form of job analysis resulting in specific and objective criteria for supervisory ratings is crucial to a proper concurrent validation study. See, Western Addition Community Organization v. Alioto, 340 F.Supp. 1351, 1354-1355 (N.D.Cal.1972). To require less is to leave the job relatedness requirement largely to the good faith of the employer and his supervisors. The complaining class is entitled to more under the Act.
 Even if the validation procedures had been proper, it was error to approve the testing procedures for lines of progression where there had been no validation study. In this case the tests were approved as a requirement for 6 lines of progression for which the tests had not been validated. While it is true that a test need not always be validated for each job for which it is required, there are narrow limits on when a test may be used without validation. The EEOC guidelines provide:
 (2) Where a test is to be used in different units of a multiunit organization and no significant differences exist between units, jobs, and applicant populations, evidence obtained in one unit may suffice for the others. 29 C.F.R. Sec. 1607.4(c) (1970).
 In this case, a failure to perform job analyses in the lines of progression involved in the validation study and in the other lines of progression for which the tests are required prevents concluding that no significant differences exist in the jobs in question.[4]
 Not only was it error to approve the testing procedures for lines of progression not validated, but it was also error to approve requiring applicants to pass two tests for positions where only one test was validated. Albemarle seeks to justify this under the business necessity rule. Albemarle originally hires all employees into a pool. From this pool the employees move into a line of progression as vacancies occur. Since it is not known into which line of progression an employee will be placed, Albemarle asserts there is nothing wrong with requiring all employees to be qualified for any line.
 Albemarle has not shown that hiring all employees into a pool is necessary to the safe and efficient operation of its business, nor has it shown that hiring employees for specific lines of progression is not an acceptable alternative. This they were required to prove to justify their policies under the business necessity test. Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971).
 Thus we hold that the district court erred in upholding the validity of the pre-employment personnel tests and in refusing to enjoin their use.
 II
 BACK PAY
 Title 42 U.S.C. Sec. 2000e-5(g) provides in relevant part:
 The court may enjoin the respondent from engaging in such unlawful employment practice, and order such affirmative action as may be appropriate, which may include reinstatement or hiring of employees, with or without back pay . . . .
 The district court found that Albemarle had practiced discriminatory employment practices and that these practices had been perpetuated through a job seniority system. Consequently, the district court enjoined Albemarle and the defendant union, Halifax Local 425, from continuing the discriminatory practices. Nevertheless, the district court, finding an award of back pay to be within his discretion, refused to award back pay to the complaining class. The reasons given by the district court for refusing such an award were that the claim for back pay was filed nearly five years after the institution of the action, and that there was no evidence of bad faith noncompliance with the Act. Neither of these is sufficient to justify the district court's refusal to award back pay.
 In Robinson v. Lorillard Corp., 444 F.2d 791 (4th Cir. 1971), a case which also dealt with a seniority system which perpetuated past discriminatory practices, the defendants made the contentions presented to us here.
 The complaint filed by the plaintiffs in the District Court did not specifically request an award of back pay . . . . At a pretrial hearing concerning the appropriateness of a class action, one of the lawyers for the plaintiffs clearly indicated that the suit was one for injunctive relief rather than recovery of lost wages. It was not until well after trial of the case, though before the judge had entered a decision, that a request was made for additional relief in the form of back pay for the class.
 444 F.2d at 802-803. In Robinson, as here:
 [B]ecause the obligation to provide back pay stems from the same source as the obligation to reform the seniority system, any general defenses relevant to the back pay award were equally relevant to the suit for injunctive relief . . . . The defendants have in no way been prejudiced by the belated claim.
 444 F.2d at 803.
 Other courts have held likewise. The Fifth Circuit held, in United States v. Hayes Int'l Corp., 456 F.2d 112 (1972), that the broad aims of Title VII require that the issue of back pay be fully developed and determined even though it was not raised until the post-trial stage of litigation.
 Also, the Seventh Circuit, in a case which was not a class action, remanded the case in order that "'relief should be made available to all who were so damaged whether or not they filed charges and whether or not they joined in the suit."' Sprogis v. United States Air Lines, Inc., 444 F.2d 1194, 1202 (7th Cir.), cert. denied, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971).
 In Robinson the argument was also made that back pay should not be awarded where the defendant had acted in good faith. Put negatively, the argument, urged by Albermarle, is
 that back pay should not be awarded in the absence of a specific intent to discriminate. A corollary argument is that the award was improper in light of the unsettled state of the law. The principal answer to both points is that back pay is not a penalty imposed as a sanction for moral turpitude; it is compensation for the tangible economic loss resulting from an unlawful employment practice. Under Title VII the plaintiff class is entitled to compensation for that loss, however benevolent the motives for its imposition.
 444 F.2d at 804. See also, Johnson v. Goodyear Tire & Rubber Co., 349 F.Supp. 3, (S.D.Tex., 1972) (also a seniority case where good faith was present).
 The only significant difference between Robinson and the present case is that in Robinson the district court had awarded back pay and the district court below refused to award back pay. The question then is whether, in light of the broad aims of Title VII, this court may affirm the opposite result as to back pay on similar factual situations because such award rests in the discretion of the district judge.
 "Discretion in a legal sense necessarily is the responsible exercise of official conscience on all the facts of a particular situation in the light of the purpose for which the power exists." Bowles v. Goebel, 151 F.2d 671, 674 (8th Cir. 1945) (emphasis added). Thus in determining the proper scope of the exercise of discretion, the objective sought to be accomplished by the statute must be given great weight. Hecht Co. v. Bowles, 321 U.S. 321, 331, 64 S.Ct. 587, 88 L.Ed. 754 (1944). Where a district court fails to exercise discretion with an eye to the purposes of the Act, it must be reversed. Wirtz v. B. B. Saxon Co., 365 F.2d 457 (5th Cir. 1966); Shultz v. Parke, 413 F.2d 1364 (5th Cir. 1969).
 "The clear purpose of Title VII is to bring an end to the proscribed discriminatory practices and to make whole, in a pecuniary fashion, those who have suffered by it." Bowe v. Colgate-Palmolive Co., 416 F.2d 711, 720 (7th Cir. 1969). In light of the congressional purpose, courts should give "a wide scope to the act in order to remedy, as much as possible, the plight of persons who have suffered from discrimination in employment opportunities." Rowe v. General Motors Corp., 457 F.2d 348, 354 (5th Cir. 1972).
 Also, as we stated in Robinson, "[t]he back pay award is not punitive in nature, but equitable-intended to restore the recipients to their rightful economic status absent the effects of the unlawful discrimination." 444 F.2d at 802. See also, Johnson v. Georgia Highway Express, Inc., 417 F.2d 1122, 1125 (5th Cir. 1969).
 Because of the compensatory nature of a back pay award and the strong congressional policy embodied in Title VII, a district court must exercise its discretion as to back pay in the same manner it must exercise discretion as to attorney fees under Title II of the Civil Rights Act. See Bowe, supra 416 F.2d at 719. Thus, a plaintiff or a complaining class who is successful in obtaining an injunction under Title VII of the Act should ordinarily be awarded back pay unless special circumstances would render such an award unjust.[5] Newman v. Piggie Park Enterprises, 390 U.S. 400, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968). See Bowe, supra 416 F.2d at 719-720.
 Because there are no such special circumstances here, on remand the district court should include an award of back pay in its order. It is to be remembered, of course, that a back pay award is limited to damages which are actually suffered. Lea v. Cone Mills Corp., 438 F.2d 86 (4th Cir. 1971).
 Reversed.
 BOREMAN, Senior Circuit Judge (concurring in part and dissenting in part):
 I am in agreement with the result reached by Judge Craven in that portion of his opinion which holds that Albemarle Paper Company has failed to show a business relationship between the racially biased tests administered to prospective employees, and its personnel requirements. However, from that portion of his opinion reversing the district court's refusal to award back pay, I must respectfully dissent.
 The appellants advance multiple theories in their effort to persuade this court to modify the relief granted below to include an award of back pay. The two arguments approved and adopted by Judge Craven are: first, the equation of Sec. 706(g) of the Civil Rights Act of 1964, 42 U.S.C. Sec. 2000e-5(g), with Sec. 706(k) of the Act, 42 U.S.C. Sec. 2000e-5(k), which provides for an award of attorney's fees in the discretion of the court and under which the federal courts have held attorney's fees are to be awarded as of course,[1] in the absence of "special circumstances;" and second, that failure to grant back pay was an abuse of discretion under Robinson v. Lorillard, 444 F.2d 791 (4 Cir. 1971).
 In Lea v. Cone Mills, 438 F.2d 86, 88 (4 Cir. 1971), this court, over my strenuous objections stated in dissent, extended the holding of the Supreme Court in Newman v. Piggie Park Enterprises, 390 U.S. 400, 402-403, 88 S.Ct. 964, 19 L.Ed.2d 1263 (1968), that attorney's fees should ordinarily be granted in suits under Title II of the Act,[2] to include suits under Title VII as well. A study of the relevant sections and the reasoning behind the Newman and Lea decisions reveals the fallacy of a comparison between the provision for attorney's fees and for back pay.
 The pertinent provisions with respect to the allowance of attorney's fees under Title II and Title VII are virtually identical, and each was considered by Congress as sufficiently significant to be expressed in an individual subsection.[3] However, the grant of authority to award back pay is found in a completely different subsection of Title VII, the congressional separation of these two provisions indicating an intent to treat them independently. Furthermore, the subsection in which the provision for back pay is found generally sets out the equitable remedies which the district court may utilize in fashioning relief should the complaining party prevail, indicating no congressional intent to give an award of back pay any greater presumption of appropriateness than its companion remedies.[4]
 More significant, however, is the reason for which the district courts' discretion was found to be limited with respect to the award of attorney's fees to prevailing parties plaintiff. In bringing an action against an employer (or manager of a public accommodation under Title II) for discrimination in the operation of his business, the plaintiff is more than a private party litigant; he acts as a "private attorney-general" in vindicating the interests of the public, and it is this advancement of the commonweal that is the basis for allowing attorney's fees as of course.[5] Such a public purpose is not present in the more delicate task of fashioning the appropriate equitable relief to fit the peculiar fact pattern of each case, and the monetary award is intended to redress purely private inequities.[6]
 I must conclude, therefore, that the award of back pay, unlike the grant of attorney's fees, is an element of affirmative relief which has been entrusted to the more general discretion of the district courts.[7]
 Judge Craven's opinion also apparently adopts the view that this court's decision in Robinson v. Lorillard, supra stands for the proposition that under facts similar to those in Robinson, it would be an abuse of the district court's discretion to deny a request for back pay. Such a construction misinterprets the holding in Robinson and the proper scope of appellate review of discretionary decisions. The burden of persuasion falls on the party attempting to show an abuse of discretion and not on the successful party below.[8] In Robinson the holding of this court was that the appellant company failed to show, under the factual situation before the district court, that it was an abuse of discretion to award back pay, not that back pay was mandated under those circumstances. The term "discretion"[9] denotes that more than one acceptable alternative is available and the choice of the most appropriate is properly left in the hands of the district courts which are more intimately involved with the ambiance of the cases and the merits of each position than are the Courts of Appeal.[10]
 " 'We must keep in mind that the discretion is to be exercised by the district court and not by a court of review. This court should not substitute its discretion for that of the district court.' " (Emphasis supplied by Larson.) Larson v. United States, 296 F.2d 167, 170 (8 Cir. 1961).
 The first reason assigned by the district court for its refusal to award back pay-that there was no evidence of bad faith noncompliance with the Act as evidenced by the active recruitment of Negroes into the company's training program for certain skilled lines of progression as early as 1964, the company-initiated merger of some lines of progression to increase advancement opportunities and good faith attempts to validate its testing procedures-[11] is not sufficiently compelling, in and of itself, to support a denial of back pay. In Robinson this court made clear that the remedy of back pay is not in the nature of a punishment but is an equitable measure to restore those discriminated against to their proper economic position had the complained of actions not occurred.[12] This is not to say, however, that the good faith of the company may never be taken into account in considering and determining the proper relief to be granted.[13] Should there exist equitable factors of which the district court may properly take cognizance, and which are supportive of a decision to deny back pay, then innocence and good faith efforts on the part of the employer may be factors to be weighed in the balancing of equities.
 Some insight into the proper application of that equitable balancing power may be gained from an examination of the third argument advanced by the appellants, a comparison of Sec. 706(g) with Sec. 10(c) of the National Labor Relations Act, 29 U.S.C. Sec. 160(c). In the case of Phelps Dodge v. N.L.R.B., 313 U.S. 177, 61 S.Ct. 845, 85 L.Ed. 1271 (1941), which was decided under Sec. 10(c), the Labor Board had ordered reinstatement of a discriminatorily discharged employee together with a full award of back pay, although the employee had not earned wages during the period of his lay-off. In remanding to the Board for modification in light of the principle of mitigation of damages, the Supreme Court stated:
 [T]he advantages of a simple rule must be balanced against the importance of taking fair account, in a civilized legal system, of every socially desirable factor in the final judgment. The Board, we believe, overestimates administrative difficulties and underestimates its administrative resourcefulness. Here again we must avoid the rigidities of an either-or-rule. The remedy of back pay, it must be remembered, is entrusted to the Board's discretion; it is not mechanically compelled by the Act. And in applying its authority over back pay orders, the Board has not used stereotyped formulas but has availed itself of the freedom given it by Congress to attain just results in diverse, complicated situations. (313 U.S. at 198, 61 S.Ct. at 854.)
 The primary factor given by the district court in the instant case was prejudice to the interests of the company arising from representations made by the appellants in their status as plaintiffs below. During the early stages of this case, the company moved for Summary Judgment and in replying to that motion,[14] the plaintiffs set out the limits of the relief sought:
 It is important to understand the exact nature of the class relief sought by plaintiffs. No money damages are sought for any member of the class not before the court, nor is specific relief in the way of job changes, promotions or the like being sought for any member of the class not before the court. The only relief sought for the class as a whole is that defendants be enjoined from treating the class as a separate group and discriminating against the class as a whole in the future. . . .
 
 
 
 22
 * * *
 
 
 23
 [T]he matter of specific individual relief for other class members is not before this Court.
 
 
 24
 Judge Craven in the majority opinion erroneously characterizes the prayer for back pay as merely a tardy request, when as illustrated above, it in fact was a reversal of express representations made three and one-half years prior to the request for additional relief.[15] This situation is plainly distinguishable from Robinson, in which the oral representation by counsel for the plaintiffs that no monetary relief was sought was made at pre-trial conference. The prejudice to Albemarle stemmed not from a failure of defenses, with which this court was concerned in Robinson, but from the unconscionably long delay between the express disclaimer and the unindicated, abrupt reversal of position.
 
 
 25
 Rule 54(c), Federal Rules of Civil Procedure, provides that the federal courts "shall grant the relief to which the party in whose favor it is rendered is entitled, even if the party has not demanded such relief in his pleadings," but this is not the ordinary case of a mere failure to request a specific form of relief; here there was an express and formal disclaimer of intention to seek that particular remedy. An opposng party should be permitted to rely on such a statement, and to the extent that in relying thereon he has acted to his detriment,[16] ] Rule 54(c) does not mandate the grant of the contested award.[17]
 
 
 26
 More importantly, Rule 54(c) is merely the vehicle by which the party is to obtain the "relief to which he is entitled." The relief and the entitlement thereto are to be determined by the district court under Sec. 706(g), and Rule 54(c) cannot compel the grant of relief which is within the discretion of the district court. The court below did not base its refusal to award back pay on the failure to request such relief pursuant to Rule 8(a), F.R.Civ.P., but by virtue of its discretionary powers under Sec. 706(g); the source of the claim of authority for granting the award sought is the very source relied upon by the court below to deny the request.
 
 
 27
 I do not find it possible to say that the reasons assigned by the district court in support of its decision not to award back pay show an abuse of discretion, and I would therefore affirm the decision below. Under the circumstances here I would not be willing, in any event, to go beyond a direction to the district court to investigate the propriety of awarding back pay with respect to those named plaintiffs actually before the court since the representations of the appellants in their Memorandum in Opposition to Summary Judgment explicitly indicate an intent to seek affirmative, individual monetary relief only for themselves, a relatively small group, and for no others.
 
 
 28
 ALBERT V. BRYAN, Senior Circuit Judge (dissenting in part, and concurring in part):
 
 
 29
 I would affirm the District Court's refusal to enjoin the employee testing practices of Albemarle Paper Company. However, I would reverse for its deprival of the employees of an opportunity to recover back pay, if any, lost by reason of the practice of fixing seniority on a job instead of a plant basis.
 
 
 30
 One cannot read the District Judge's opinion without being impressed by its thoroughness, completeness and fairness. Overall, save for the disallowance of back pay just mentioned, I think the opinion honors the dictates of the Civil Rights Act of 1964 and squares with the exactions of the Act as expounded in Griggs v. Duke Power Company, 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).
 
 
 31
 While Judge Craven's recitation of the facts is altogether accurate, I would add this synopsis. A full appraisal of the Court's ruling calls for review of the steps taken by Albemarle to meet the statute's demands. Before the effective date of the Civil Rights Act of 1964, Albemarle commenced recruitment of black applicants from the nearby high schools for participation in the company's apprentice program. It also sought applications from among its black employees.
 
 
 32
 Following Griggs, Albemarle conducted validation studies of its testing requirements. To this end an acknowledged expert in such matters was retained. He gauged his study by the manual, among others, issued August 1, 1970 by the Equal Employment Opportunity Commission, entitled "Guidelines of Employee Selection Procedures". Pursuant to his directions each employee was given three well-known tests, the Wonderlic, Forms A and B, and the Beta. The tests purported to show the employee's capability to do the work assigned him. His performance was thereafter rated twice by two different supervisors, who made independent evaluations without knowledge of his test scores.
 
 
 33
 The test results and job ratings were sent to Purdue University for statistical correlation. The District Judge found:
 
 
 34
 "35. The results of the validation study, presented both in statistical and graphical form, showed positive correlations of a statistically significant nature for nine of the ten specific job groupings. . . ."
 
 
 35
 The expert advised that "the company utilize these tests for its initial hiring", observing, however, that "no test or set of tests will validate for all jobs." With this evidence in mind, I look to the errors ascribed in Judge Craven's opinion to the District Court's refusal to direct Albemarle to abolish or change its testing procedures.
 
 
 36
 I. First, I cannot agree that the employer did not validate the tests and relate them to the jobs in all the lines of skilled employment. The District Judge found otherwise, saying: "The group tested was typical of employees in the skilled lines of progression". This, for me, is a conclusion that the groups tested fairly exemplified the remaining groups and also fairly represented the qualifications existing in all the skilled lines. This reading of his factual findings is reinforced by his later statement: The personnel tests administered at the plant have undergone validation studies and have been proven to be job related". (Accent added.) This statement, I understand, encompasses all the groups at the plant, whether tested directly or by sample. Such a method of testing in a multiunit organization is, as noted by Judge Craven, approved by the Guidelines of Employee Selection Procedures, supra, Sec. 1607.5.
 
 
 37
 The breadth of the expert's survey is described in his report as follows:
 
 
 38
 "General Summary:
 
 
 39
 "Inspection of the correlations and charts shown in this report shows quite conclusively that both the Beta and Wonderlic A tests can be reasonably used for both hiring and promotion for most of the jobs in this mill. . . . The EEOC could not reasonably object to these standards in the light [of] the validation data covered in this report." (Accent added.)
 
 
 40
 Secondly, in view of the findings by the Court that validation studies had been applied to the personnel tests and that the tests had been proved to be job related, I cannot join in the determination that discrimination resulted from the absence of "job analyses". It seems to me that these findings necessarily recognize that the equivalent of "job analysis" was utilized. In rating the employees, the jobs' features were undeniably considered, for the supervisors were unquestionably familiar with these elements.
 
 
 41
 Thirdly, also unwarranted, it seems to me, is criticism of the District Court's acceptance of the company's practice of "requiring applicants to pass two tests for positions where only one test was validated". The two are the Beta and Wonderlic. Beta (non-language) measures merely native intelligence, while Wonderlic (verbal) tests reading ability. The District Court justifies its approval of Albemarle's utilizing both tests because it was a business necessity. The Court found that the complexity of Albemarle's newly adopted machinery made reading an absolute requirement for the safe and efficient operation of the machines and called for employees "with a high level of native intelligence". A personal inspection of the machinery revealed the intricacy to the judge.
 
 
 42
 Each of these aptitude tests is "demonstrably a reasonable measure of job performance". Griggs, at 436, 91 S.Ct. at 856. Thus they are their own proof of their validation. My understanding is that a test cannot be declared discriminative if it searches for an indispensable factor of a job. Griggs, supra, at 431, 91 S.Ct. 849.
 
 
 43
 It does not appear from the District Judge's findings that low scores on one or both tests would bar all applicants for employment. Decisions on employment in non-technical areas are apparently not made solely upon test results, but include such considerations as experience, references and interviews.
 
 
 44
 In my judgment the District Judge, in regard to the testing requirements, exercised a cautious solicitude, both for the employees' entitlements and the employer's obligations under the Civil Rights Act of 1964. His injunction against a high school education as a job prerequisite and against the use of job seniority instead of plant seniority removed the employees' sustainable grievances. Ten days were devoted to the hearing of the case-July 26 to August 5, 1971. With this industry and application, along with the knowledge of the rigors of Griggs, as well as of the EEOC guidelines, the District Judge did not, to my mind, omit or deviate in any significant degree from the Act. It must be remembered, throughout, that the three items of the District Judge's determination just enumerated constitute findings of fact, and I cannot say they are clearly erroneous.
 
 
 45
 II. Lastly, recovery was asked by the plaintiffs for "the amount of pay which would have accrued to the employees had there been no unlawful practice". Under the Act, 42 U.S.C. Sec. 2000e-5(g), back pay may be ordered in accompaniment of an injunction-and only then-against an employer who has engaged in "an unlawful employment practice" and has done so "intentionally".
 
 
 46
 As Judge Craven notes, the District Court found that "Albemarle has practiced racially discriminatory employment . . . prior to July 2, 1965 and that the effect of this discrimination had been perpetuated through a job seniority system". Accordingly the Court issued an injunction, pursuant to the Act, against the maintenance of this discrimination, terming it "an unlawful employment practice" and concluding that it had been committed "intentionally". No objection was made by the employer to this finding and conclusion, and no appeal taken from the injunctive order. Indeed, in the oral argument of the appeal the appellee-defendants conceded that the District Judge had indeed stated this conclusion on "intentionally".
 
 
 47
 For this reason I think back pay lost by an employee through the company's resort to job-seniority should be recovered. Of course, the reimbursable loss must be proved to be the direct result of the invidious practice and, as Judge Craven admonishes, the grant of monetary relief is not to exceed the "damages which are actually suffered".
 
 Conclusion
 
 48
 In sum, as set forth in Part I hereof, I dissent from Part I of Judge Craven's opinion; but I concur with the award, in his Part II, of back pay insofar as it is granted for loss occasioned by the job seniority practice, as explained in my Part II.
 
 
 
 [1]
 It was demonstrated in plaintiff's exhibits that on the Wonderlic Series 96 percent of whites passed as opposed to 64 percent of blacks. This corresponds with the national average as determined in a study by the authors of the test. Negro Norms, A Study of 38,452 Job Applicants for Affirmative Action Programs, E. F. Wonderlic & Assoc., Inc. (1970)
 
 
 [2]
 "[T]he applicable test is not merely whether there exists a business purpose for adhering to a challenged practice. The test is whether there exists an overriding legitimate business purpose such that the practice is necessary to the safe and efficient operation of the business. Thus, the business purpose must be sufficiently compelling to override any racial impact; the challenged practice must effectively carry out the business purpose it is alleged to serve; and there must be available no acceptable alternative policies or practices which would better accomplish the business purpose advanced, or accomplish it equally well with a lesser differential impact."
 Robinson v. Lorillard Corp., 444 F.2d 791, 798 (4th Cir. 1971). See also, Note, Employment Testing: The Aftermath of Griggs v. Duke Power Company, 72 Colum.L.Rev. 900, 908 (1972).
 
 
 [3]
 Sec. 703(a)(2), (h) provides in relevant part:
 "Notwithstanding any other provision of this subchapter, it shall not be an unlawful employment practice for an employer . . . to give and to act upon the results of any professionally developed ability test provided that such test, its administration or action upon the results is not designed, intended or used to discriminate because of race, color, religion, sex or national origin."
 42 U.S.C.A. Sec. 2000e-2(h).
 
 
 [4]
 The appellants also question the validity of the validation study because the employees tested were primarily from higher level, rather than entry level, positions. As pointed out by the EEOC guidelines, 29 C.F.R. Sec. 1607.4(c)(1) (1970), such a validation technique is permissible only where new employees will progress to the higher level "within a reasonable time and in a great majority of cases." As stated by Cooper & Sobol, Seniority and Testing under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1649 (1969):
 In addition, the problems inherent in test use are compounded by the fact that the higher level jobs may not be reached for several years, during which time an employee may improve his capabilities. This possibility seems particularly likely in the case of an individual whose potential has been artificially suppressed through discrimination, in education and otherwise. In order for a promotability interest to justify test use, therefore, it is essential that the test have been properly evaluated and shown to be predictive of performance at some job level to which promotions can be expected in the reasonable future.
 In Griggs the Court failed to reach the question of whether a testing procedure which takes into account higher level job requirements is permissible. 401 U.S. at 432, 91 S.Ct. 849. We likewise fail to reach this question because of insufficient evidence below as to the time in which it takes an employee to progress to higher level jobs.
 
 
 [5]
 For examples of such special circumstances said to justify refusal of a back pay award, see Schaeffer v. San Diego Yellow Cabs, Inc., 462 F.2d 1002 (9th Cir., June 20, 1972); Le Blanc v. Southern Bell Tel. & Tel. Co., 333 F.Supp. 602, 610-611 (E.D.La.1971), aff'd, per curiam, 460 F.2d 1228 (5th Cir. 1972)
 
 
 [1]
 Lea v. Cone Mills, 438 F.2d 86, 88 (4 Cir. 1971)
 
 
 [2]
 Accord, Wooten v. Moore, 400 F.2d 239, 242 (4 Cir. 1968)
 
 
 [3]
 Title II, 42 U.S.C. Sec. 2000a-3(b):
 (b) In any action commenced pursuant to this subchapter, the court, in its discretion, may allow the prevailing party, other than the United States, a reasonable attorney's fee as part of the costs, and the United States shall be liable for costs the same as a private person.
 Title VII, 42 U.S.C. Sec. 2000e-5(k):
 (k) In any action or proceeding under this subchapter the court, in its discretion, may allow the prevailing party, other than the Commission or the United States, a reasonable attorney's fee as part of the costs, and the Commission and the United States shall be liable for costs the same as a private person.
 
 
 [4]
 The authorities generally deal with injunctive relief as within the discretion of the district courts. E. g. Sprogis v. United Air Lines, 444 F.2d 1194, 1202 (7 Cir. 1971)
 
 
 [5]
 Lea v. Cone Mills, 438 F.2d 86, 88 (4 Cir. 1971). See, Jenkins v. United Gas Corp., 400 F.2d 28, 32 (5 Cir. 1968). Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1254 (1971)
 
 
 [6]
 See, Austin v. Reynolds Metals, 327 F.Supp. 1145, 1153 (E.D.Va.1970)
 
 
 [7]
 E. g., Schaeffer v. San Diego Yellow Cabs, 462 F.2d 1002, 1006 (9 Cir. 1972); LeBlanc v. Southern Bell Tel. & Tel., 460 F.2d 1228, 1229 (5 Cir. 1972); United States v. Dillon Supply Co., 429 F.2d 800, 804 (4 Cir. 1970); Johnson v. Georgia Highway Express, 417 F.2d 1122, 1125 (5 Cir. 1969). Developments in the Law-Employment Discrimination and Title VII of the Civil Rights Act of 1964, 84 Harv.L.Rev. 1109, 1265 (1971)
 
 
 [8]
 LeBlanc v. Southern Bell Tel. & Tel., 460 F.2d 1228, 1229 (5 Cir. 1972)
 
 
 [9]
 The Supreme Court has defined "discretion" as follows:
 The term "discretion" denotes the absence of a hard and fast rule. . . . When invoked as a guide to judicial action it means a sound discretion, that is to say, a discretion exercised not arbitrarily or wilfully, but with regard to what is right and equitable under the circumstances and the law, and directed by the reason and conscience of the judge to a just result.
 Langnes v. Green, 282 U.S. 531, 541, 51 S.Ct. 243, 247, 75 L.Ed. 520 (1931).
 
 
 [10]
 United States v. Dillon Supply Co., 429 F.2d 800, 804 (4 Cir. 1970):
 The government has urged us to remand with directions to enter specific injunctive relief. After careful consideration we have concluded to deny this request. The fashioning of effective and appropriate injunctive relief depends in part on the discretion of the district court. The function of the courts of appeal is to review the relief which the district court grants in light of findings and the supporting record and to determine if there has been an abuse of discretion.
 
 
 [11]
 In 1963 the company discontinued the use of the Bennett Mechanical Comprehension Test, which is regarded to be racially biased (See Cooper and Sobol, Seniority and Testing Under Fair Employment Laws: A General Approach to Objective Criteria of Hiring and Promotion, 82 Harv.L.Rev. 1598, 1641 n. 16 (1969)) in favor of Wonderlic A & B tests
 
 
 [12]
 444 F.2d 791 at 802, 804
 
 
 [13]
 See, Schaeffer v. San Diego Yellow Cabs, 462 F.2d 1002, 1006-1007 (9 Cir. 1972)
 
 
 [14]
 The answer was filed on November 22, 1966
 
 
 [15]
 The request was first communicated to the company on June 4, 1970
 
 
 [16]
 Illustrations of the detriment arising from the reliance of the defendants upon the express disclaimer by the plaintiffs of their intention to seek back pay for members of the class generally, were argued before the district court at pretrial conferences: (1) The extensive period of time taken for prosecution of the suit exposed the defendants to the unexpected hazard of a potentially enormous award, unavailable for consideration during their continued efforts to arrive at a settlement, and which threatened the financial viability of the defendant paper mill. (2) During the hiatus with respect to the back pay claim, the paper mill was sold by the defendant Ethyl Corp. to the defendant Hoerner-Waldorf Corp., with the transfer agreement taking express notice of the pendency of suit, a strong indication of the impact the status of that suit had upon the deliberations of the principals. (3) The inordinately long delay tended to preclude the defendants from adequately preparing a defense to individual claims, due to the impossibility or impracticality of deposing witnesses and claimants nearly five years after the occurrences of events of which plaintiffs complain
 
 
 [17]
 Rental Development Corp. v. Lavery, 304 F.2d 839, 842 (9 Cir. 1962)