Willie STAMPS et al., Plaintiffs,

v.

DETROIT EDISON CO. et al.,
Defendants.

UNITED STATES of America,
Plaintiffs,

v.

DETROIT EDISON CO. et al.,
Defendants.

Civ. A. Nos. 36515, 38479.

United States District Court,
E. D. Michigan, S. D.

Oct. 2, 1973.

David W. Allen, Robert P. Gallagher and Michael A. Middleton, Dept. of Justice, Washington, D. C., for United States.

Roger E. Craig, Detroit, Mich., William B. Gould, Professor of Law, Stanford, Cal., for other plaintiffs.

Richard Ford, Detroit, Mich., for Detroit Edison Co., defendant.

Rolland O'Hare, Detroit, Mich., for Local 17, International Brotherhood of Electrical Workers, defendant.

Sanford Jay Rosen, New York City, for American Civil Liberties Union, plaintiffs.

Raymond Willis, Detroit, Mich., for Assn. for the Betterment of Black Employees, and others, plaintiffs.

## OPINION AND ORDER

KEITH, District Judge.

### I. INTRODUCTION

The Complaint in Civil Action No. 36512 was filed by the above captioned plaintiffs [1] on May 17, 1971. The Complaint in Civil Action No. 38479 was filed by the Government on June 22, 1972. This Court on July 21, 1972 ordered the cases consolidated after finding there to be common issues of law and fact. The Court has previously made a finding that the remaining plaintiffs have standing and may prosecute this class action law suit under the statutes and court decisions invoked and specified by plaintiffs. Jurisdiction is conferred on this Court inasmuch as the cases arise under the Civil Rights Act of May 31, 1870, c. 114, 16 Stat. 140, 42 U.S.C.A. § 1981; the Civil Rights Act of 1964, 78 Stat. 259, 42 U.S.C.A. § 2000e–5(e); the National Labor Relations Act, 61 Stat. 136, 29 U.S.C.A. § 151 and § 185; and 28 U.S.C.A. §§ 2201 and 2202.

### II. THEORIES OF THE PARTIES

The Final Pretrial Order entered by this Court and signed by all parties dated January 12, 1973, states the following theories of the litigants:

### A. THEORY OF PLAINTIFF UNITED STATES:

The following is a brief statement of the government's theory:

Until recent years, the defendant Detroit Edison Company discriminated against its black employees by excluding them from its desirable jobs except in token numbers. Prior to the end of 1968 the Company employed a relatively small number of blacks in a few jobs, primarily as janitors and

---

1. At the time of filing, there was an additional party plaintiff in Civil Action No. 36512, namely, the Association for the Betterment of Black Edison Employees. The Association was dismissed on Jan. 26, 1973 as a party plaintiff for lack of standing.

servicemen in the Building and Properties Department, as utility servicemen and more recently as laborers and stockmen in the Stores and Transportation Department. These few jobs in which blacks were employed offered lower pay than most of its skilled trade occupations and little or no advancement opportunities. Some whites were also employed in these low opportunity jobs, but virtually no blacks were employed in high opportunity, skilled jobs. Many black employees who were limited to low opportunity jobs possessed qualifications equal to or greater than many of the whites whom the Company hired without prior skills or experience and trained for specific trades or crafts within the Company. Since 1965, when Title VII of the Civil Rights Act became effective, the Company has hired blacks in some formerly all white jobs, especially in clerical jobs, in increasing numbers; but its high opportunity hourly paid occupations remained virtually all white until after 1968, and blacks remained concentrated in low opportunity jobs.

The collective bargaining agreements between the Company and the defendants, Local 17 and Local 223, grant preference to employees already in high-opportunity departments and occupational groups in competition for vacancies in those departments and occupational groups and allow employees who transfer to new departments and occupational groups no credit for time spent in their former departments when competing for future promotions or retention against layoff. A transferring employee who begins at the bottom of a new line of progression or occupational group must also work at a reduced pay rate if this new position pays less than his former position.

Although racially neutral on their face, these collective bargaining provisions carry forward into the present and future the effects of the Company's pattern of excluding blacks from high opportunity jobs by allowing whites the benefit of seniority and preferred bidding positions obtained during a time when blacks were not able to acquire the same advantages. The Courts have uniformly held that where the effects of such a pattern of discriminatory job assignment are carried forward by the operation of such a seniority system, Title VII of the Civil Rights Act of 1964 requires that the responsible defendants provide the class of affected black employees with the employment opportunities they would have received but for the pattern of racial assignment or exclusion. Therefore, the government requests an injunction providing an affected class of black incumbents (i. e., those who were assigned to lower paying jobs on the basis of their race) with opportunities to compete for positions in high opportunity occupational groups on the basis of their Company seniority, to transfer, if successful, without loss of earnings, and to carry their Company seniority with them to such new occupational groups for all purposes, including future promotions and protection against layoff. The government also requests a determination that the defendants [2] are liable to pay back pay to those affected class members, who in an ancillary proceeding, may be shown to have suffered financial loss as a result of the pattern of racially discriminatory assignment.

Until the commencement of Title VII enforcement proceeding, and until

2. The government expects the evidence to demonstrate that the Company is primarily responsible for the discriminatory practices which have resulted in lost earnings to black employees. Section 706(g) of Title VII provides for such a determination of responsibility. However the government is not prepared at this time to waive all back pay claims against the defendant Unions. [Footnote quoted from Government's Theory]

the present in the case of some practices, the defendant Company has discriminated against black applicants and potential applicants for employment in its recruiting and hiring practices. Despite recent increases in the number of blacks hired, in 1972 the Company employed approximately 860 blacks, making up only 7.5% of the Company's total employment of approximately 11,500. Approximately 55% of the Company's work force is employed in the City of Detroit which has a black population of 44%. Approximately 75% of the Company's work force is employed within Wayne County which has a black population of 27%; and approximately 85% of its work force is located within the three county area.

The Courts have held in Title VII cases that where blacks traditionally have been excluded from employment, affirmative steps are necessary to recruit and employ qualified applicants. The government therefore requests an injunction requiring the Company to cease relying on recruiting through friends and relatives of incumbent employees; to exercise more direct control over the hiring decisions of its department supervisors; to remove test standards as a barrier to black hiring; and, subject to the availability of qualified applicants, to recruit and hire blacks throughout the Company and in specific occupational groups in accordance with numerical goals sufficient to overcome past exclusion of blacks within a reasonable time.

B. THEORY OF PRIVATE PLAINTIFFS:

The theory of private plaintiffs Complaint is as follows:

Racial discrimination with regard to both hiring and promotion is proved by the small number of black employees employed at Detroit Edison. The percentage of blacks employed in the work force of Detroit Edison—particularly in the classifications of official, manager, and skilled craftsmen—is substantially smaller than the percentage of blacks in the City of Detroit. Overt and active racial discrimination has been practiced by defendants against individual black employees through 1973.

Certain practices, arguably neutral and non-discriminatory on their face —have the effect of perpetuating past discrimination and embody such discrimination in the present system:

1. Word of mouth referrals by incumbent white employees of Edison and the compilation of lists of employees who have been recommended by such incumbent whites by various Edison Department Heads.

2. An interview system which does not put employees on notice as to the job opportunities in the company and which accordingly has the effect of denying blacks higher paying jobs because their friends and relatives are blacks, and unlikely to have held such jobs or to know of such jobs in any kind of detail.

3. A departmental and job seniority system utilized for competitive status jobs which penalizes the black employee who has seniority granted in a lower paying job or department because a past discriminatory hiring policy has relegated blacks to such jobs and departments. Moreover, some black employees would be required to take wage cuts in order to transfer.

4. Non-job related tests utilized for both hiring and promotion which have the effect of screening out blacks disproportionate to whites and/or preserve the discriminatory status quo.

5. Educational and other non-job related requirements which screen out blacks disproportionate to whites and/or preserve the discriminatory status quo.

6. Subjective criteria and interview system which screens out blacks disproportionately both from employment and better paying jobs and/or preserve the discriminatory status quo.

7. Subjective criteria utilized by supervisors and other responsible corporate officials and/or preserve the discriminatory status quo.

8. The existence of all white and near all white supervisory workforce has the effect of excluding black employees from consolidation for both hiring and promotion.

Defendant unions liability are specifically predicated upon the following factors:

The negotiation of the above-referred-to-seniority system which embodies within it the effects of past discrimination;

The failure to take any kind of affirmative action through negotiation, arbitration, or any other means to alter defendant Edison's discriminatory hiring and testing policy;

Individual instances of discrimination against black employees who had appropriate seniority credits under the collectively negotiated system but who nevertheless were excluded for other reasons and for whom the union refused to act affirmatively;

Black employees denied promotion because of discrimination:

The difference between the amount of pay in the job or department where discrimination has prevailed and the amount of pay that such employee has in fact received.

Black employees denied hiring because of discrimination:

The difference between the amount of pay in the job or department in which discrimination prevailed and the amount of pay that such individual earned or might have earned with reasonable diligence.

Edison, through its supervisory and other employees had retaliated, intimidated and interrogated Black employees because of the filing of the original complaint with the Equal Employment Opportunity Commission and the subsequent suit filed in the District Court.

C. THEORY OF DEFENDANT EDISON COMPANY:

The vaguely-worded allegations, charges, and claims made against Defendant Detroit Edison Company (hereinafter referred to simply as Defendant) are without basis in fact or law. Defendant continues to deny each and every one of them.

Affirmatively Defendant says that its employment practices have been and are free from racial discrimination. If any of its employment practices have resulted or do result in differential racial impact (and Defendant does not admit that they have or do), such practices have been and are necessary to the business in which Defendant engages. Defendant has and does recruit, hire, transfer, and promote qualified persons according to their availability and their ability without regard to race or color. Any exceptions to this policy have been and are in favor of black persons pursuant to the standards set down by federal and state government.

Furthermore, Defendant has and does vigorously attempt to further the interests of black persons in equal employment opportunity over and above what is required by law or regulation. True to this goal, Defendant has pursued and will continue to pursue the development of an effective affirmative action program at the Detroit Edison Company.

D. THEORY OF DEFENDANT LOCAL 223:

Local 223 continues to adhere to the denials and affirmative defenses set out in the answers heretofore filed.

It denies engaging in any act, pattern or practice violative of Title VII. It denies that the collective bargaining agreements it has negotiated with the Detroit Edison Company violate the law. It denies that it has failed or refused to represent any person or group of persons employed by the Detroit Edison Company or has differentially treated any person or group of persons for which it is the recognized collective bargaining agent employed by the Detroit Edison Company because of the race of that person or group of persons.

E. THEORY OF DEFENDANT LOCAL 17:

Local 17 continues to adhere to the denials and affirmative defenses set out in the answers heretofore filed.

It denies engaging in any act, pattern or practice violative of Title VII. It denies that the collective bargaining agreements it has negotiated with The Detroit Edison Company violate the law. It denies that it has failed or refused to represent any person or group of persons employed by The Detroit Edison Company or has differentially treated any person or group of persons for which it is the recognized collective bargaining agent employed by The Detroit Edison Company because of the race of that person or group of persons.

III. SUMMARY OF THE FINDINGS AND CONCLUSIONS OF THE COURT

Plaintiffs have alleged, among other things, that The Detroit Edison Company has traditionally excluded blacks in a discriminatory manner from its high opportunity skilled trades and supervisory positions and that it continues to discriminate against blacks in its hiring and promotion policies and practices. The plaintiffs have also alleged that the Defendant Unions, which are parties to collective bargaining agreements with the Company, have aided and abetted the Company in its discrimination.

This Court has listened carefully to the presentation of evidence in the course of a three month trial in this cause. The evidence was overwhelming that invidious racial discrimination in employment practices permeates the corporate entity of The Detroit Edison Company. The Court finds as proven facts that upward mobility of blacks presently employed at Detroit Edison is almost non-existent, and that qualified potential black employees are refused employment or refrain from applying for employment because of the Company's reputation in the Black Detroit Community for racial discrimination. The Company has taken the position that if any inequities exist between blacks and whites at Detroit Edison, such inequities have accidentally evolved and have not resulted from deliberate discrimination. While this Court believes that the law would require it to find that Detroit Edison has violated the law if it has, without intent to discriminate, fostered practices which have resulted in a racially discriminatory impact, the evidence in this case demonstrates that the Company's discrimination has been deliberate and by design.[3]

---

3. "Proof of actual intent to discriminate is not a prerequisite to a finding of an unlawful employment practice. Intent is inferred from the totality of the conduct. All we need to show is that 'X' intended to engage in the practice that has a discriminatory impact, not that 'X' intended to discriminate. 'X' may not even be aware that the result of his or her practices are in fact discriminatory. The relevant test for determining whether a practice is discriminatory is whether the effect of it serves to exclude a disproportionate number of persons in a protected class. An employment practice which is based in part on unlawful considerations is not saved by the fact that other non-discriminatory considerations may also have been present." William H. Brown, Chairman, Equal Employment Opportunity Commission, "The Changing Concept of Discrimination," Contact, July 1972, p. 33. See generally Griggs v. Duke Power Co., 401 U. S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971).

It is the conclusion of the Court that Defendant Detroit Edison must alter its posture in the area of race relations and immediately begin to deal with the problem of racial discrimination seriously and with moral integrity if it is to fulfill its obligation under the law. It is a matter of public knowledge in this community that new leaders have taken over the management of this important Company. It is imperative that, if this Company is to move forward economically and competitively as its management wants it to, equal employment opportunity for all must be one of the yardsticks, as well as increased sales and profit margins, by which the Company measures its achievements and accomplishments.

It is unfortunate in the view of the Court, that the Company has consistently refused to admit, much less seek to remedy, that its employment practices perpetrate racial discrimination. Indeed, the Company at trial simply denied that it has ever engaged in racial discrimination in employment:

"The Court: Is it your position on behalf of Detroit Edison, Mr. Ford, that as you have checked the records, and you have done it very masterfully and meticulously, that Edison has never been guilty of any racial discrimination in its employment policies?

Mr. Ford: Yes sir.

The Court: That is your position?

Mr. Ford: That is my position, and anybody that thinks differently is certainly invited to come forward with the evidence of it and I don't believe they can do it." [Transcript, pages 113–114.]

It is the conclusion of the Court, in light of the evidence adduced, that the Company is refusing to acknowledge the obvious and has therefore adopted an intractable position. Its denials of culpability only serve to indicate the myopia

in the history of the Company with regard to its recognition and treatment of the ignoble disease of racial discrimination. Implicit in these Findings and Conclusions is the guiding principle that the Company will not be allowed to continue to violate the law with impunity and will, instead, be required to implement corrective measures designed to treat the root causes of the conditions which bring the Company in violation of the law.

With regard to the Defendant Unions, the Court has heard evidence during the course of the trial that the collective bargaining engaged in by these Unions has resulted in agreements perpetrating racial discrimination and preventing affirmative action to eliminate racial discrimination and the vestiges of such discrimination. The Unions encouraged black employees to withdraw or not press grievances protesting discrimination practices. Collective bargaining agreements define seniority in a way that represses the possibility of advancement by black employees. Defendant Local 223 has misinformed black members with advice that unsuccessful bids involving jobs outside their departments cannot be put through the grievance procedure under the collective bargaining agreement. Defendant Local 223 has insisted upon adherence to seniority where black members were involved to a much stricter degree than for whites. Defendant Local 223 and the Company have deliberately gerrymandered seniority districts so as to deny black members promotional opportunities in the better paying jobs. Defendant Local 223 and Defendant Local 17 have negotiated for and acquiesced in procedures which lock blacks into low opportunity jobs and have never protested the obviously discriminatory practices of the Company. The President of Defendant Local 223 has insisted upon rerun elections solely for elected black officials, has attempted to exclude blacks from leadership positions, and has failed to take steps against threatening and hostile actions and atti-

tudes of white members expressed towards black members. Defendant Local 17, by referring workers to the Company has directly aided and abetted the Company's discriminatory hiring practices. The unions have an especially heavy burden to represent the best interests of all of their members. The evidence clearly demonstrates that they failed to do so in this case.

The long and short of the evidence with respect to the Defendant Unions is simply that the Unions have promoted the interests of its white members without regard to the interests of its black members, and have ignored the plight of the black members in gaining the equal employment opportunity that is their due under the Constitution and laws of the United States. Tragically, the Unions, which one would look to for leadership in improving the lot of this sector of the population, have instead become an obstacle to human progress to the point where the Court has reluctantly concluded that they are justifiably made defendants in this law suit.

The Constitutional provisions and the statutes enacted by Congress on the subject of equal employment opportunity all find their objective in the brief and eloquent phrase of Thomas Jefferson in the Declaration of Independence:

> "We hold these truths to be self-evident, that all men are created equal, that they are endowed by their Creator with certain unalienable Rights, that among these are Life, Liberty and the Pursuit of Happiness. * * * "

In the modern industrial society which is the United States, and certainly in the modern industrial urban society which is Detroit, to be denied an equal chance at decent employment, and an equal chance at advancement within one's employment, is to be denied that equality so nobly articulated by Jefferson. It is in this context unthinkable that a person would be denied equal employment opportunities at The Detroit Edison Company when employment to a man means earning a living which will enable him to provide adequately for his family and provide a good education for his children. Being denied a job is demeaning to a person and strips him of his dignity and assurance. A person has a right to extend his God-given working abilities to their fullest without being encumbered by artificial, irrelevant, insignificant and superficial barriers, and reasons such as the color of his skin.

The Company and the Unions by their individual and collective actions are guilty of denying this fundamental equality to the members of the class who are the plaintiffs in this law suit, and the Court will accordingly move on to consider and put into effect suitable remedies.

## IV.  FINDINGS OF FACT

### A.  *Preliminary Findings*

1.  Defendant, Detroit Edison Company, is a public utility, incorporated under the laws of the State of Michigan and doing business in a 7,600 square mile area in southeastern Michigan, where it furnishes electric power to homes, businesses and offices in the Metropolitan-Detroit area. The Detroit Edison Company employs approximately 11,000 employees.

2.  Defendant Local 223, Utility Workers Union of America, is an unincorporated association doing business in the State of Michigan and is the exclusive bargaining representative for approximately 4,000 employees working in job classifications represented by Local 223 and grouped in approximately 28 bargaining units.

3.  Defendant Local 17, International Brotherhood of Electrical Workers, is an unincorporated association doing business in the State of Michigan and is the exclusive bargaining representative for approximately 800 hourly paid em-

ployees working in job classifications in the Underground Lines and Overhead Lines, Field Division, of the Transmission and Distribution Department and the Elevator Division of the Building and Properties Department.

4. The Standard Metropolitan Statistical Area (SMSA) racial statistics for 1970 indicate that 44% of the City of Detroit is composed of blacks and 18.-2% of the SMSA total population is black. As of 1971, 73.28% of Detroit Edison's employment positions were in Wayne County and 84.11% were in the Tri-County area. As of 1966, 304 of Edison's 9,475 employees were black. At that time, 4 of Edison's 1,722 officials and managers were black (1966 EEOC Report).

### B. Edison Employment Practices— Generally

5. Testimony shows that for many years Edison employed only a few blacks and only in menial jobs such as janitor, porter, shoe shine boy, elevator operator, and utility servicemen. In the 1940's, '50's and '60's prior to and subsequent to July 2, 1965, Detroit Edison had a reputation of hiring few blacks. Defendant Detroit Edison has had a reputation of limiting those blacks who were hired to low-opportunity jobs such as those which are known as of this time to be 1) In the Property Right of Way Department—Building Cleaner, Janitor, Porter, Serviceman, Wall Washer, Lamp Changer, Elevator Operator and Attendant; 2) In what is now the Stores and Transportation Department—all jobs except for Mechanic; 3) In the Production Department—Plant Cleaner; 4) In the Central Heating Plant, Coal and Ash Handler. Such jobs are low-opportunity jobs because of certain posting, bidding and seniority provisions which give an almost absolute preference to employees already in high opportunity jobs, units and departments.

### C. Union Representation— Background Facts

6. The record reflects that all collective bargaining representatives for Lo-cal 223, Utility Workers of America; Local 17, International Brotherhood of Electrical Workers; and Detroit Edison are white with the exception of plaintiff Willie Stamps. All collective bargaining representatives of all three parties have always been white except for plaintiffs Stamps, James Atkinson and William Armstead, all of whom have been division chairmen in Local 223, Utility Workers of America. All officers of Defendant Detroit Edison are white. At the time of the trial in this case, Stamps was the only black out of approximately 28 chairmen from Local 223 and the only black on either side of the bargaining table.

### D. Specific Indicia of Racial Discrimination

7. The evidence submitted in this case indicates that defendant Detroit Edison Company has in the past assigned those few blacks who were hired almost exclusively to the low-opportunity jobs referred to in Finding No. 5, *supra*. Defendant Detroit Edison employed no black linesmen in Transmission and Distribution Overhead Lines until 1963. It employed no black sub-station operators until 1968. It employed no black meter readers until 1964. The stated reason of Detroit Edison Company for not employing black meter readers was that the white community was not ready. Defendant Detroit Edison employed no black appliance repair servicemen until 1962.

8. Beginning in the mid or late 1950's, Detroit Edison Company had its personnel interviewers use a racial code or identification system to identify the race of applicants on application forms. The system consisted of the interviewers placing a black dot on the application forms of black applicants so that the race of a black applicant could be easily ascertained at any point in the hiring process. This Court finds that the racial code or identification system was used by Detroit Edison to racially discriminate against black applicants. The defendant Detroit Edison asserted and

maintained through the course of the trial that this black dot system was inaugurated to insure that more blacks became employed at the Company. The record and testimony in the case negates this position, and indicates very clearly that the black dot system was used to perpetuate and maintain blacks in low paying positions in the Company and exclude them from others. This coding system was known to and acquiesced in by the highest levels of Detroit Edison Company's employment office and management.

9. The disparity in numbers of whites and blacks hired at Detroit Edison has a historical basis which continues to exist to this day. In 1955, 232 whites and 4 blacks were hired. In 1956, 199 whites and 5 blacks were hired. In 1957, 97 whites and 3 blacks were hired. At some point between 1955 and 1957, the racial coding system came into being. In 1958, 18 whites and 1 black were hired. In 1959, 29 whites and 1 black were hired. In 1960, 39 whites and no blacks were hired. In 1961, 52 whites and 2 blacks were hired. In 1962, 74 whites and 2 blacks were hired. In 1963, 142 whites and 9 blacks were hired. In 1964, 229 whites and 33 blacks were hired. in 1965, 481 whites and 34 blacks were hired. In light of the fact that so few blacks were hired, subsequent to the implementation of the racial coding system, this Court can only infer that the racial coding system was instituted for some purpose other than that of achieving racial equality in the employment practices of the Edison Company. Indeed, during the six years subsequent to the introduction of the racial coding system the percentage of blacks hired by Defendant Detroit Edison declined.

10. Testimony demonstrates, and this Court finds, that in many cases black employees with work experience and education superior to that of white employees in skilled trades, were denied high opportunity jobs and were assigned to and refused transfer from low-opportunity jobs, referred to above. White employees lacking a high school diploma or related work experience were and continued to be frequently promoted ahead of black employees with high school diplomas and work experience superior to said white employees.

11. The foregoing-described practices may be illustrated by a few representative examples. Horace Henry, a black high school graduate with credit hours at Detroit City College and an inspector for the government during World War II was refused transfer from utility serviceman from 1945 through 1962 or 1963. Local 223 Utility Workers Union of America encouraged Mr. Henry to withdraw grievances protesting transfer refusals. McKinley Ogletree, a black employee, was hired as a utility serviceman in 1945 and was an apprentice electrician from 1950 through 1955. Mr. Ogletree filed numerous requests for transfer to an electrician's job from 1950 to 1969 and was always denied the right to transfer, being advised by Detroit Edison representatives that "You know you're not going to get the job." Catherine Gafford and Mary Harris, black female elevator operators and high school graduates filed numerous applications for transfers in the 1940's, '50's and '60's without being given the opportunity to transfer.

12. Both prior to and subsequent to July 2, 1965, plaintiff James Atkinson was discriminatorily assigned to low-opportunity jobs. In connection with his applications for transfers and promotions, James Atkinson was advised by Detroit Edison representatives that it was futile for him to apply and that a decision had been made concerning who would get the job before bids were invited. In some situations, Atkinson had observed the job performed whereas the successful white applicant had not. In other situations, Atkinson had actually performed the work which he sought whereas the successful white applicant had not.

13. Plaintiff Willie Stamps, a high school graduate with further education at the Dunbar Trade School in Chicago and Worshin College of Mortuary Science was discriminatorily refused employment on at least five occasions at Detroit Edison Company in 1956 and between 1965 and 1967. In 1965 and 1966, Stamps was deprived of employment on the pretext that he was not properly dressed and that he was over-weight. On approximately fifteen occasions between 1967 and 1972, Stamps was denied transfer because of his race. In no instance has the Company contended that white employees who were selected instead of Stamps possess superior or equal qualifications. Among the pretexts used to discriminate against Stamps was the contention that he was over qualified for the job for which he applied. Stamps was also harassed and discriminated against by Defendants Detroit Edison and Local 223 because of his civil rights activities at Detroit Edison.

14. The record in this case indicates that in order to implement and perpetuate discriminatory policies and practices, Detroit Edison relied heavily on its transfer policies with respect to low-opportunity and high-opportunity jobs. High-opportunity jobs possess pay grades and working conditions demonstrably higher and superior to the pay grade of low-opportunity jobs. High-opportunity jobs for blue collar employees at Detroit Edison are in, for instance, Construction and Maintenance, the Transmission and Distribution Departments and the Production Department. Starting pay grades in Construction is generally pay grade 5 ($4.32 per hour). Skilled trade jobs such as Brickmason, Carpenter, Electrician, Mechanic Fitter, Plumber, Rigger and Welder enable journeymen to receive wages between pay grades 16 ($5.935 per hour) and 18 ($6.27 per hour). In Transmission and Distribution, the pay grade for Maintenance Cable Splicer reaches 18 ($6.27 per hour). In Production and Senior Plant Operator it reaches 17 ($6.13 per hour).

15. In low-opportunity jobs—out of which transfer to high-opportunity jobs is precluded because of Detroit Edison's posting, bidding and seniority as described below—the *highest* pay grade is 5 ($4.32 per hour). For example, Building Cleaner is pay grade 2 ($4.03 per hour) and Building Attendant begins at pay grade 0 ($3.89 per hour). Coal-Ash Handler in Production (Central Heating) is pay grade 3 ($4.125 per hour) and Plant Cleaner begins at 2 and can advance to 3. High opportunity jobs have been and remain nearly all white.

16. As of April 24, 1973, there were 832 blacks out of 10,630 employees. As of April 24, 1972, there were 12 blacks and 1,099 whites in supervisory positions by the Defendant Detroit Edison Company. As of April 24, 1972, there were 73 blacks and 1,785 whites in professional and technical jobs. As of April 24, 1972 the 24, 1972, in bargaining unit jobs represented by Local 223, at the Delray Plant, there were 14 blacks and 113 whites. There are 9 white firemen earning $4.9 to $5.46 but there are no black firemen. There are 20 general mechanics A employees earning $5.26 to $5.93 but there are no blacks. There are seven white instrument men but no black. The greatest percentage of blacks at Delray are to be found at the plant cleaner classification where there are 4 whites and 2 blacks. At the Conner Creek Plant there are 156 whites and 20 blacks. There are 21 general mechanic A white employees but no blacks. There are 6 general mechanic apprentices but no blacks. There are 9 white instrument men but no black instrument men. Once again, the most significant percentage of blacks is to be found among plant cleaners where there are 7 white plant cleaners and 3 blacks. In the Marysville plant there are 142 white employees and 5 blacks. There are 22 white power plant operators and one black. There are 29 white assistant power plant operators and two blacks. There are no

blacks in the classification of turbine operator, auxiliary, combination firemen, senior plant operator, water tender, switchboard operator 1st, yard equipment operator, coal handling equipment operator, general mechanic A, general mechanic A apprentices, instrument man, plant warehouse man, and senior tool crib man.

17. In the Trenton production plant there are 225 white employees and 3 black employees. Once again there are no black employees with such classification as general mechanic A, and general mechanic A apprentice, and instrument man. The only classification in which blacks are present are plant cleaner, tool crib man and coal handling yard operator. In the St. Clair Plant, there are 178 white employees and 4 black employees. Three of these black employees are in the classification of plant cleaner and fourth is a serviceman. There are no blacks in the classification of general mechanic A, general mechanic A apprentices and instrument man.

18. In the River Rouge plant there are 99 white employees and 12 black employees. There are 17 white general mechanic A employees and one black general mechanic A employee. There are 6 general mechanic A white apprentices and one black general A apprentice. There are 17 white instrument A men and no black instrument employees. However, there are 3 white plant cleaners and 6 black plant cleaners, this classification once again providing the highest percentage of black participation. At the Industrial Power Plant & Penn Salt there are 52 white employees and 4 black employees. There are seven general mechanics A white employees and no general mechanic A black employees. There are 2 general mechanic A white apprentices and one general mechanic A black apprentice. At the Port Huron plant there are 13 white employees and no black employees. At the Monroe plant there are 100 white employees and 2 black employees. There are no black general mechanic A employees in these jobs at the Monroe plants. The 2 blacks

are in the classification of plant cleaner and utility man. At the Wyandotte North Industrial plant there are 37 white employees and 5 black employees. At the Wyandotte South Industrial plant there are 50 white employees and 1 black employee.

19. At central Heating there are 87 white employees and 16 black employees. In the meter department there are 116 white employees and 10 black employees. Until approximately 1968 it was the practice of defendant Detroit Edison Company to deliberately exclude black employees from the meter department because of the fear of community reaction. Although seniority was not always adhered to in connection with job assignments in the meter department prior to the time that blacks were hired, once blacks were hired and protested the undesirable route into which they were placed because of their low seniority, defendants Detroit Edison Company and Local 223 refused to alter such assignments even though seniority was not uniformly adhered to in the past in connection with such assignments.

20. In the Stores Department there are 201 whites and 34 blacks. In the Transportation Department there are 92 whites and 22 blacks. The highest percentage of blacks is to be found in the Utility Servicemen classification where there are 19 whites and 13 blacks. Until some point subsequent to July 2, 1965, the Utilities Servicemen classification was one of low opportunity classifications to which blacks were assigned in the overwhelming number of instances. There are 47 white auto mechanics and one black auto mechanic. There are 4 white mechanic apprentices and 1 black mechanic apprentice.

21. In the electrical substations represented by Local 17, International Brotherhood of Electrical Workers, there are 334 whites and 15 blacks. There are no black journeymen first or second class and out of a total of 67 journeymen positions 3 are held by blacks. In the transmission and Distribution and Overhead Department, repre-

sented by Local 17, IBEW, there are 741 whites employed and 21 blacks. There are 221 white journeymen linemen employed and 4 black journeymen linemen. Ninety-one apprentice linemen are employed and 6 blacks are so employed. There are 105 white journeymen linemen B Crew and 2 blacks. In most classifications in the department, no blacks are employed.

22. In the Transmission and Distribution Underground represented by Local 17, IBEW, there are 337 white employees and 38 blacks. In the journeymen and apprentice categories for cable splicers, there are 170 whites employed and 8 blacks. The most significant percentage of blacks in the department is to be found in the labor category where there are 5 blacks and 20 whites. In the construction field division represented by Local 223, Utility Workers of America, there are 851 whites employed and 50 blacks. Among electrical journeymen and apprentices there are 176 whites and 8 blacks. Among journeymen apprentice carpenters, there are 34 whites and 3 blacks. There are 34 whites and 4 blacks employed in the Pipe Cover Category. There are 31 white painters and 2 black painters. There are 24 Sheetmetal workers and 1 black Sheetmetal worker. There are 69 white welders and 3 black welders. There are 269 white mechanic fitter journeymen apprentices and 11 blacks.

23. In construction Shops Department represented by Local 223, there are 142 whites and 21 blacks. There are no black shop machinists. In the Customer Service Division there are 236 whites and 22 blacks. In the Meter Reading Department Districts there are 378 whites and 10 blacks. Except for 1 black at the River Rouge Plant, the classification of general mechanic A is all white. The classification of general mechanic A apprentices remains almost completely white.

24. In Transmission and Distribution and Overhead Department journeymen and apprentice linemen are almost all white. The same is true for most other classifications in the department. In Transmission and Distribution Underground, journeymen and apprentice cable splicer are almost completely all white classifications. In Construction, electricians, journeymen and apprentice, journeymen and apprentice carpenters, pipecoverers, sheetmetal workers, welders, and shop machinists are almost all white classifications. It would be fair to say that there is an almost complete statistical absence of blacks in most classifications.

25. In Buildings and Properties Department there are 141 whites and 78 blacks. The overwhelming majority of the blacks work as janitors, servicemen and elevator operators, which are the other categories in addition to those of utility servicemen and others referred to above, to which blacks were restricted in the overwhelming percentage of instances until some point subsequent to July 2, 1965.

26. Testimony at trial clearly shows that subsequent to July 2, 1965, defendant Detroit Edison Company had, and continues to have, a reputation in the black community in the Metropolitan area as an employer that generally does not hire blacks and continues to assign those blacks that are hired to low opportunity, non-promotable jobs such as those described above. Many blacks who have been hired at Detroit Edison believe that they are fortunate to be employed with Edison on any basis and they are afraid to protest the absence of blacks at Detroit Edison in numbers representative of their presence in the Detroit City population.

27. It is important to observe that until some point subsequent to July 2, 1965, all hiring interviewers who hired employees for defendant Detroit Edison Company were white. Through the present date no attempt has ever been made with either black or white interviewers to determine whether such in-

terviewers are racially prejudiced nor have any steps been taken to correct such prejudice if it exists.

28. Applicants are asked if they have relatives employed by the Company. A percentage of employees hired by Detroit Edison have been hired as the result of contacts through friends and relatives. A study of the Federal Bureau of Investigation in the course of which 86 white employees were contacted indicates that 43 of such employees had friends and acquaintances who were employed by Detroit Edison and discussed job opportunities with such friends and relatives. Since a disproportionate percentage of employees at Detroit Edison Company are white and since the overwhelming percentage of employees in the higher opportunity jobs referred to above are white, such a hiring practice in this instance had the effect of perpetuating the exclusion of black applicants from employment with Detroit Edison Company and from the jobs referred to above.

29. Interviewers and supervisory personnel in high opportunity jobs and departments make the final decision regarding who is to be employed in such departments. Hiring takes place as the result of word-of-mouth recruitment. In order to advance to high opportunity jobs and departments such as Production, Construction, Transmission and Distribution and Electrical Substations, employees must be hired into those departments at an entry level in practically every instance. All interviewers and supervisory personnel in departments which contain higher opportunity jobs are white. Supervisory personnel in departments which contain higher opportunity jobs are white. Supervisory personnel in such departments have no personal and social contact with blacks. Thirty-five and four-tenths percent of white employees who applied to Detroit Edison Company in 1969–1970 had relatives employed by the Company. Six-

teen and three-tenths percent of such white employees had relatives in the same department where they sought employment. Thirty-seven and one-half percent of white employees had relatives employed by the Company. Fourteen and two-tenths percent of the white employees have relatives employed in the same department. This phenomenon in practice perpetuates the racial composition of the work force. Until September, 1972, Edison's applicants were asked if they had arrest records. Interviewers, until the eve of the trial of this case, have been required to make extremely subjective judgments about an applicant's personality, appearance, dress and speech. There is no structured or written format for questions to be asked of applicants which is provided interviewers by the Company. Defendant Detroit Edison did not list employment vacancies with the Michigan Employment Security Commission until required to do so by law in late 1971 or early 1972.

30. After an employment application is rejected by Edison, an employee may renew his application by expressing continued interest in employment with the Company. An interviewer may mark an application "unrated". This generally means that the applicant cannot be considered further. If an interest in renewal of the application is not expressed by the applicant, the unrated application will be destroyed at the end of a 6 month period. If a renewal of interest is expressed the unrated application will be held for another 6 month period. In 1968, 12.5 percent of white applicants and 22.5 percent of black applicants were unrated. In 1969 it was 10.9 percent for whites and 18.5 percent for 4 blacks. In 1970 it was 17.9 percent for whites and 26.9 percent for blacks. In 1969 and 1970, blacks hired at Detroit Edison Company continued to be disproportionately assigned to low opportunity jobs.

### E. Testing

31. The only standards which Edison does apply uniformly in the selection of applicants are standards of performance on written mental ability tests which are administered to nearly all applicants who reach the final stage of consideration in the employment department before referral to line department supervisors for final consideration. (Tr. Vol. IX, pp. 129–130; Vol. VIII, pp. 44–46)

32. The Company administers a variety of test batteries, each consisting of one or several tests, in its selection of new employees for entry level hourly paid and clerical jobs. The following table shows the test batteries which are administered to candidates for those entry, level jobs at issue here:

| Test Battery | Entry Level Job |
| --- | --- |
| Mechanical Placement | Utility Serviceman, Appliance Repair, Meter Reader, Janitor, Construction Laborer, Warehouse & Yard Laborer, Metal Shop Helper, Stockman |
| Clerical Placement | Messenger, File Clerk, General Clerk, Telephone Clerk, Customer Telephone Rep., Commercial Office Rep., Computer, Programmer, FT Steno, FT Typist, Switchboard Operator, Tab Machine Operator, Janitor, Warehouse & Yard Laborer |
| Apprentice Lineman | Apprentice Lineman |
| Apprentice Draftsman | Draftsman General, Junior Draftsman, Rodman |
| Customer Serviceman | Customer Serviceman |
| Substation Operator | Substation Operator |
| Apprentice Cable Splicing | Laborer Conduit |
| Meter Reader | Meter Reader |
| Power Plant | Assistant Power Plant Operator, Substation Operator Trainee, Coal Ash Handler |
| Henry Ford Comm. College Proficiency Test | Construction Laborer |

(Gov. Ex. 19)

---

33. A larger percentage of the black applicants for employment have failed these tests than the percentage of white applicants for employment who have failed them. Edison's employment department relies on its psychological services section for test administration and evaluation. (Tr. Vol. VIII, pp. 44–46). This section ordinarily evaluates an applicant's test performance by either reporting him as "acceptable" or "not recommended" depending on whether he has given sufficient numbers of right answers and thereby passed certain fixed standards of performance (Tr. Vol. XXI, p. 27). The following table shows for each test battery listed above, except the apprentice lineman's battery,

the approximate proportion of white and black applicants taking each test who received evaluations of "not recommended" and were not hired in 1970 and 1971:

| Test | 1970 | | 1971 | |
| --- | --- | --- | --- | --- |
| | White | Black | White | Black |
| Cable Splicer | 31.8 | 66.7 | 29.2 | 67.3 |
| Meter Reader | 26.7 | 66.7 | 0 | 50.0 |
| Draftsmen | 0 | 0 | 15.8 | 25.0 |
| Customer Serviceman | 51.9 | 85.7 | 57.6 | 61.1 |
| Power Plant Operator | 37.8 | 77.0 | 37.5 | 61.9 |
| Substation Operator Helper | 44.6 | 78.9 | 42.9 | 69.8 |
| Mechanical Placement | 25.2 | 68.5 | 24.8 | 52.8 |
| Clerical Placement | 21.4 | 63.2 | 21.7 | |

(Gov. Ex. 91)

34. Although insufficient numbers of blacks have taken the apprentice lineman's battery to conclude from their performance that blacks have failed this battery more often than whites (Gov. Ex. 83), this test would exclude a greater percentage of blacks than whites if increased numbers of blacks were measured by it. This battery consists only of tests which are also included in several other batteries which blacks have taken at Edison frequently, and they have consistently scored significantly lower on each of these tests in such batteries (Tr. Vol. IX, pp. 82–86; Gov. Ex. 83).

35. For most applicants, both black and white, meeting the prescribed cutoff scores or performance standards on test batteries they are given is a prerequisite for employment. While a small fraction of those applicants hired into some entry level jobs have not met all of the standards of performance on all of the tests in the batteries administered for their jobs, (Gov. Ex. 100), the overwhelming majority of those applicants who do not meet these standards are not employed in the occupations for which they are tested (Gov. Ex. 100; 91).

36. The Company has also administered an entrance examination for the Henry Ford Community College on which a passing score has been required as a condition of admission to courses offered there as part of the Construction and Maintenance Department apprenticeship training. Obtaining such a passing score has been an additional prerequisite for entry into these apprenticeship programs. (Tr. Vol. VII, p. 122). Among those employees who could be race identified who have taken this college entrance examination, the failure rate among blacks has been significantly higher than that among whites (Gov. Ex. 92).

37. Under guidelines promulgated by the Equal Employment Opportunity Commission, an employer may use a test which has the effect of excluding significantly larger numbers of blacks than whites only if the test has been shown to be a valid predictor of job performance. "Validity" as used by the Equal Employment Opportunity Commission means that the relationship of test scores to an appropriate criterion of job performance must, at a minimum, be statistically significant at the 95 percent level of confidence. Stated another way, this means that there must be no more than one chance in 20 that the relationship between test scores and the measure of job performance occurred by chance. Guidelines on Employee Selection Procedures (revised), 35 Fed.Reg. 12333, 29 C.F.R. 1607.5(c)(1)

38. The EEOC Guidelines also require that validity be established separately or "differentially" for blacks

where absence of sufficient numbers of blacks among those employed makes such differential validation infeasible, the tests in question may be regarded as valid on the basis of other evidence only provisionally until separate evidence of validity for the minority group is produced. A test which otherwise has the effect of under predicting the job performance of blacks should be scored in such a way as to correct this. 29 C.F.R. 1607.5(b)(5)

39. Measurements of such relationships, often expressed as correlation coefficients, are determined by comparison of test scores and performance criteria measures for groups of individuals who have been tested and also rated on the job. A correlation coefficient is high or low depending on whether individuals in the group tend to have test scores and criterion ratings of corresponding levels (Tr. Vol. XXIII, pp. 156–160). It is possible for such a correlation to achieve the level of statistical significance required by the EEOC Guidelines while a substantial number of the individuals in the group among whom the correlation is computed have combinations of test scores and performance criterion ratings contrary to the trend, that is substantial numbers receiving high test scores may have lower performance ratings than others who received lower test scores and substantial numbers who received low test scores may have received higher performance ratings than those receiving higher test scores (Tr. Vol. XXIV, pp. 4–5, 96–98, 104–109, Gov. Ex. 103, p. 345, Gov. Ex. 107).

40. The EEOC Guidelines, also require that cut-off scores or test standards must be related to "normal expectations of proficiency" in the work force and that they be reasonable, 29 C.F.R. 1607.6. Unless the relationship, or correlation, between test performance and criteria of job performance is very high, a reasonable cut-off score should eliminate only those applicants who are likely to be insufficiently qualified to perform the job satisfactorily (Tr. Vol. XXV, pp. 85–88).

41. None of the test batteries described in the preceding findings has been demonstrated both to be valid predictors of job performance, as measured by statistical comparison to criteria of job performance, and to be used with performance standards, or cut-off scores, reasonably designed to eliminate those applicants who are unlikely to perform satisfactorily in the jobs for which they are being considered and tested.

42. Differential validity, that is separate validity for blacks as a group apart from the general population of applicants and employees, has not been demonstrated for any of the batteries in issue here. Differential validation was attempted or evidence tending toward differential validation was presented, in only four of the studies described, the clerical and mechanical placement battery studies done by National Compliance Company (Gov. Ex. 102 pp. 115–139); the meter reader battery study and the assistant power plant operator studies done by Edison (Gov. Ex. 99, 101, Tr. Vol. XXII, pp. 22–23). These studies were insufficient to establish validity for whites or blacks, and therefore they are deficient in evidence of differential validity (See Findings 99–105, 110, 113–114).

43. The customer serviceman battery, which is found to have been valid at the time of the study, apart from the lack of justification for its cut off scores, has not been demonstrated to be differentially valid for blacks as there is no evidence that there were blacks in the study group in 1965 (Tr. Vol. XXI, pp. 69–93).

44. Edison has made no effort to validate the Henry Ford Community College entrance examination (Tr. Vol. XVIII, pp. 6–133, Vol. XXI, Vol. XXII, Vol. XXIII, pp. 5–47).

45. The only standards for selection of applicants for employment or transfer which are uniformly applied by the

Company have been passing scores on batteries of mental ability tests administered by the Company. Because blacks generally score lower than do whites on many such tests, several of the test batteries used by Edison have screened out larger proportions of black applicants than of white applicants. With one exception, none of these test batteries are valid predictors of job performance; and without exception none of them are valid for blacks as a separate group. One of the batteries in fact may be "unfair" to blacks in that it under-predicts their performance relative to whites. Also without exception, all of these batteries are administered with cut-off scores which are unreasonably high, in that they screen out applicants whose scores are comparable to former and current employees who were not shown to be unable to perform in their jobs.

### F. Specific Indicia of Union Involvement

46. Evidence submitted in this case shows that seniority, as defined by the collective bargaining agreement between Detroit Edison Company and Local 17 IBEW, is occupational group seniority and is the measure of seniority to be considered in matters of layoffs, rehiring, promotions and transfer within and among the occupational groups covered by the agreement. Promotions within each bargaining unit are awarded to the senior bidding employee possessing the required skills, abilities and/or adaptability. In a small percentage of the cases, less than 10 percent of them, the junior employees successfully bid for the job. The posting provisions of the agreement between defendants Local 17 and Detroit Edison Company provide that all permanent vacancies in the bargaining unit will be posted in all divisions of the department in which the vacancy occurs except in the case of the journeymen linemen classification. The promotion and posting provisions establish a priority for employees who are within the bargaining unit and the department for filling bargaining unit vacancies. If the Company is unable to fill the vacancy through either employees in the bargaining unit or department, the vacancy is posted for company-wide bidding. No preference is given to an employee who is not in the bargaining unit in which a vacancy occurs.

47. The record further reflects that under both the Local 223 agreements, an employee bidding from outside the bargaining unit or the department, should he be successful, is unable to carry with him any of the seniority he might have accumulated in his former job for purposes of both future promotions and bidding on vacancies in which the occupational group bargaining unit. His competitive status is lower than that of employees who are junior to him in the Company's service but who are nevertheless senior in the occupational group and/or bargaining unit or department seniority. Both Local 17 and Local 223 agreements with Detroit Edison Company do not protect the rate of an employee who is transferring to a high opportunity job in a new bargaining unit which has a rate lower than the job from which he is transferring. Accordingly, such an employee may suffer a reduction in economic benefits under this system, which provides for complete loss of seniority and pay reduction for black employees assigned to low opportunity jobs. Such blacks are being discouraged from applying for high opportunity jobs. Moreover, in many instances such black employees do not even have the opportunity to bid.

48. Seniority as defined in the collective bargaining agreement between Local 223 Utility Workers Union of America and Detroit Edison Company is once again occupational group seniority for the purpose of layoff, rehiring, promotions and transfers between bargaining units covered by the agreement. Promotions to vacancies within an occupational group within the bargaining unit are awarded on the basis of occupational group seniority. In less than 10 percent of the bidding situations a junior employee is chosen over a senior employee.

Under the Local 17 agreement, the junior employee is successful in even fewer instances. The posting provisions of the collective bargaining agreements between Local 223 and Detroit Edison Company provide the vacancies within a bargaining unit which are not filled by an employee within the occupational group itself in which the vacancy occurs shall first be posted in the bargaining unit where the vacancy exists. When a vacancy is not filled through employees in the bargaining unit it may be posted in other bargaining units in the same department and, at that point, the measure of seniority considered is Company service. If vacancies are not filled through this procedure the vacancy is posted companywide. This procedure makes it unlikely that blacks, who have been and are disproportionately assigned to lower opportunity jobs, will ever have the opportunity to bid for high opportunity jobs under either the Local 223 or Local 17 contract.

49. It was revealed at trial that under the Local 223 agreement those blacks in low opportunity jobs who are fortunate enough to have the opportunity to transfer must sacrifice seniority credits previously accumulated as well as their wage rate if the entry level in the high opportunity department pays less than the job which they hold. In most instances blacks in low opportunity jobs do not have the chance to transfer to high opportunity jobs because of the bidding and postings listed above. Seniority loss and wage reduction discourage transfers for those few blacks who obtain the chance to apply for transfers. Supervisors, more than 99 percent of whom are white, must sign a transfer bid before blacks can attempt to transfer from a low to a high opportunity job.

50. Defendant Detroit Edison Company claims that it follows a policy of promotion from within. Yet its collective bargaining agreements make unlikely or impossible promotion from within of blacks who continue to be disproportionately assigned to low opportunity jobs and who are either completely excluded from or have taken responsibility in the high opportunity jobs described above. Rather than promote blacks from within the Company, Detroit Edison sometimes hires skilled tradesmen from Canada who cannot even speak English. Additionally, Detroit Edison deliberately recruits blacks with poor employment records, when it has on its payroll blacks with good employment records who cannot obtain promotion and transfer because of the intentional and unintentional discrimination on account of race.

51. Defendant Utility Workers Union, Local 223, has misinformed black members by advising such members that unsuccessful bids involving jobs outside their departments cannot be put through the grievance procedure under the collective bargaining agreement. Black employees have been discouraged from filing grievances and have not sought to use the grievance procedure to obtain relief from discrimination because of their lack of confidence in defendants Local 223 and Detroit Edison Company. Local 223 has insisted upon strict adherence to seniority for black meter readers consigned by that system to undesirable routes when seniority had not been followed uniformly for white meter readers before blacks were hired. Defendant Local 223, Utility Workers Union of America and Detroit Edison Company have deliberately gerrymandered seniority districts so as to deny black union members promotional opportunities in the better paying jobs. Defendant Local 223 has negotiated and acquiesced in discriminatory seniority, bidding and posting procedures which have the effect of locking blacks into low opportunity jobs. Defendant Local 223 apparently has never protested Detroit Edison Company's hiring or promotional policies with the Company itself, before any administrative agency—federal or state; or before any court.

52. The president of Local 223 was the only member of the Utility Worker's Executive Committee to vote against the

establishment of a human rights committee for that Union. The Local president, Pete Johnson, has insisted upon re-run elections only for black officials of Local 223. Johnson and Local 223 have attempted to exclude blacks from leadership positions and Local 223 has failed to take action to discourage the hostility and threats of white members from local 223 made against black members of Local 223.

53. Defendant Local 17 IBEW has negotiated seniority and posting provisions in its collective agreement which have the effect of locking blacks into low opportunity jobs. Defendant Local 17 has never protested Detroit Edison Company's hiring or promotion policies with the Company itself; before an administrative agency—federal or state; or before any court. Defendant Local 17 refers workers to defendant Detroit Edison Company and thus directly aides and abets Edison's discriminatory hiring.

### G. Deficiencies of Affirmative Action Program

54. Detroit Edison Company's affirmative action program involves a sporadic and occasional effort to publicize job opportunities in the black community in the Metropolitan Detroit Area and is therefore inadequate. The Detroit Edison Company has never made use of black radio stations to advertise employment opportunities at Detroit Edison Company; in fact, the Company has done nothing at all which has produced fruitful results. Defendant Detroit Edison has at various times rejected the suggestions of the plaintiff Stamps and other employees that the Company establish a training program, if blacks were indeed unqualified and that a special coordinator be assigned to deal with problems of black employees.

## V. DISCUSSION OF APPLICABLE LAW

The courts have recognized that racial discrimination in employment is class or group discrimination. See, e.

g., Jenkins v. United Gas Corp., 400 F. 2d 28 (5th Cir. 1968); Oatis v. Crown Zellerbach, 398 F.2d 496 (5th Cir. 1968); Blue Bell Boots v. EEOC, 418 F.2d 355 (6th Cir. 1969). It is Title VII of the 1964 Civil Rights Act which provides the broadest legislative mandate for eliminating racially discriminatory practices in employment.

Courts have frequently relied on statistics in the employment discrimination area because of the difficulty involved in establishing unlawful action in connection with a wide variety of individual acts where both records and witnesses may not be available after a substantial period of time and where the employer or union has primary or exclusive access to the relevant information. See, e. g., Mabin v. Lear Siegler, Inc., 457 F.2d 806 (6th Cir. 1972). The principle that "the preponderance of Negroes in lower-paying and inferior jobs, while white workers have the better work, ought to establish a *prima facie* case for Title VII violation" has now been accepted in connection with promotion as well as hiring by most of the U.S. Circuit Courts of Appeal. Gould, "Seniority and the Black Worker," 47 Texas L.Rev. 1039 (1969). There is virtual unanimity on the proposition that the statistical absence of blacks disproportionate to whites makes out a Title VII and Civil Rights Act of 1866 violation. See, for instance, Mabin v. Lear Siegler, Inc., supra; United States v. St. Louis-San Francisco Ry., 464 F.2d 301, 307 (8th Cir. 1972) cert. denied, 411 U.S. 1116, 93 S.Ct. 913, 34 L.Ed.2d 700 (1973); Brown v. Gaston County Dyeing Mach. Co., 457 F.2d 1377, 1382 (4th Cir. 1972); United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544, 550 (9th Cir.), cert. denied, 404 U.S. 984, 92 S.Ct. 447, 30 L.Ed.2d 367 (1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245, 247 (10th Cir. 1970) cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L.Ed.2d 237 (1971); U. S. v. Chesapeake & Ohio Ry. Co., 5 FEP Cases 311 (4th Cir. 1972).

■ Significantly, the United States Court of Appeals for the Eighth Circuit has gone further than the above-cited cases, stating in Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970) as follows:

"We hold as a matter of law that these statistics, which reveal that an extraordinarily small number of black employees, except for the most part as menial laborers, established a violation of Title VII . . . ." Id. at 426.

Parham, then, concludes that statistics showing "an extraordinarily" small number of blacks proves a violation rather than merely establishing a prima facie case. Even when statistics are not taken to conclusively establish discrimination—though the percentage of black workers may be extremely small—they should be given proper effect by the court when valid, and should be weighed by the court together with the testimony of witnesses. See Jones v. Lee Way Motor Freight, Inc., supra, 431 F.2d at 247. In Jones, a case that differs from the instant case in which statistics have been buttressed by witnesses' testimony, the court set forth the following language:

"True, no specific instances of discrimination have been shown. However, because of the historically all-white makeup of the company's line driver category, it well may be that Negroes simply did not bother to apply." Id. at 247.

The Court in Jones, therefore, seemed to conclude that "statistics establish a prima facie case" even in the absence of the kind of testimony which is in the record in the instant case. Id. at 247. Also pertinent is United States v. Sheet Metal Workers, International Local Union 36, 416 F.2d 123 (8th Cir. 1969), where the court, once again finding violation where the record was "devoid of specific instances of discrimination" subsequent to July 2, 1965, the effective date of Title VII, stated that

"The Act, in our view, permits the use of evidence of statistical probability to infer the existence of a pattern of practices of discrimination." Id. at 127, n. 7.

■ Statistics in this case establishing prima facie discrimination demonstrate the following: (1) a severely disproportionate and small number of blacks in the labor market area; (2) a severely disproportionate and small number of blacks employed in Edison high opportunity jobs and departments; (3) the number and percentage of blacks hired declined subsequent to the introduction of the race identification system in the 1950's; (4) a higher percentage of black applicants continue to be unrated as compared to white applicants.

The statistics indicate that prima facie violations were made out with regard to defendants not only in the past but in the present as well. Unlike Parham, for instance, where present discrimination could not be found because of the substantial improvement in the company's hiring patterns, in this case present as well as past discrimination is made out on the basis of statistics. This is dramatically demonstrated not only by the continued absence of blacks from professional, supervisory and skilled trades jobs, but also by Government's exhibit 65 which indicates that employees hired during the years 1969 and 1970 into the high opportunity jobs—especially in departments like Construction and Maintenance, Transmission and Distribution Over Head Lines and Underground Lines —continue to be predominantly white. (Indeed, most of the improvements in Detroit Edison's hiring policies took place subsequent to January 6, 1971, the date when plaintiffs filed administrative unlawful employment practices charges with both the U. S. Equal Employment Opportunity Commission and the Michigan Civil Rights Commission.)

No attempt was made by the defendants to rebut and overcome plaintiffs' prima facie case. No attempt was made, as was done in United States v. Jacksonville Terminal Co., 451 F.2d 418 (5th Cir. 1971) cert. denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815 (1972), to in-

troduce evidence showing that whites with superior qualifications or qualifications at least arguably equal were chosen for jobs from which blacks were excluded. This approach would have been completely futile for the defendants for two principal reasons: (1) defendants testified that employees are trained for positions of responsibility including skilled jobs without having to possess prior experience in advance of applying inasmuch as employees are promoted to supervision and skilled trades positions from within the Company. Accordingly, unlike *Jacksonville Terminal* where defendants were attempting to pick the "best qualified" employees on the basis of selecting those who had had previous experience in the industry or related work in other industries, defendants select employees whom they will train: (2) Government exhibits make clear that a substantial number of black employees who are held into low opportunity jobs had qualifications based upon both prior work experience and education which are demonstrably superior to a substantial number of whites who had been selected for skilled trades jobs. See Government Exhibits 14 and 15. Thus, the defendants—as was generally the case with regard to their response to testimony by individuals—did not rebut any of the inferences of discrimination that were created by virtue of statistics. Discrimination on the part of defendants can be found on the basis of the statistics noted above alone.

Although none of the statistics were rebutted, the Government and private plaintiffs went further and introduced evidence of both unintentional and intentional discrimination which substantially buttressed the statistics. Defendant Detroit Edison's only response to the statistics has been its argument that a disproportionately small number of blacks is not employed at Detroit Edison since the area that must be considered is the area to which Edison supplies electricity rather than the labor market area. Private plaintiffs correctly point out that under this inadequate

theory, the computation of statistics for a General Motors plant in Detroit, for instance, would not be based upon the working population in the Detroit area but rather any portion of the United States to which General Motors products were shipped. Significantly, the Ninth Circuit Court of Appeals in United States v. Ironworkers Local 86, supra, indicated that where a union's jurisdiction covered the Seattle Metropolitan area that only the City of Seattle might be considered on the theory that most members came from the City itself. The notion that the construction industry's product market should be utilized was not even considered. The defendant Detroit Edison seeks to rely on the district court's citation in United States v. Virginia Electric & Power Co., 327 F. Supp. 1034 (E.D.Va.1971), of the fact that the area served by the utility in that case was 18.6 percent black. But the court in that case did not rely on the figure to derive a statistical imbalance which would create a *prima facie* case of a violation. Indeed, a careful reading of the opinion indicates that such statistics were not relied upon in any way.

Defendant Detroit Edison Company employs subjective criteria for both purposes of hiring and promoting its employees and its bargaining unit and supervisory personnel—inasmuch as no specific instructions are kiven to interviewers to determine the qualifications of applicants and no objective criteria is employed by the Company as it decides who should be promoted to supervisory positions. As the Fourth Circuit Court of Appeals has said in Brown v. Gaston County Dyeing Machine Company, supra:

"Elusive, purely subjective standards must give way to objectivity is satistical indicia of discrimination are to be refuted. . . . [I]n the absence of objective criteria applied to all workers alike, the statistics indicate that race is the only identifiable factor explaining the disparity between the jobs held by white employees and jobs held by black employees. The

proof discloses no objective standards based upon education, experience, ability, length of service, reliability, or aptitude to account for the actual employment of white workers. . . . In sum, the lack of objective guidelines for hiring and promotion and the failure . . . are badges of discrimination that serve to corroborate, not to rebut, the racial bias pictured by the statistical pattern of the Company's work force." Id. 457 F.2d at 1382–1383.

This skepticism of subjective criteria can well be understood in the context of this case where high opportunity departments are staffed by an all white interviewing and supervisory staff and where permission prerequisite for applying for a transfer must be granted by an almost entirely all-white supervisory workforce. As stated by Judge Brown, speaking for an unanimous court in Rowe v. General Motors Corp., 457 F.2d 348 (5th Cir. 1972):

". . . Blacks may very well have been hindered in obtaining recommendations from their foremen since there is no familial or social association between these two groups. All we do today is recognize that promotion/transfer procedures which depend almost entirely upon the subjective evaluation and favorable recommendation of the immediate foreman are a ready mechanism for discrimination against Blacks much of which can be covertly concealed and, for that matter, not really known to management. We and others have expressed a skepticism that Black persons dependent directly upon decisive recommendations from whites can expect non-discriminatory action." Id. at 359.

Chief Justice Burger, speaking for an unanimous Supreme Court in Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed.2d 158 (1971), held that in the area of employment discrimination, good intent or the absence of discriminatory intent does not redeem employment procedures or testing mechanisms that are unrelated to measuring job capability. "The *only* justification for standards and procedures which may, even inadvertently, eliminate or prejudice minority group employees is that such standards or procedures arise from a non-discriminatory legitimate business necessity." Rowe v. General Motors Corp., supra, 457 F.2d, at 354. The Court in *Griggs* was careful to emphasize that

"Congress directed the thrust of the Act at the *consequences* of employment practices—not simply to motivation. More than that, Congress has placed upon the employer the burden of showing that any given requirement must have a manifest relationship to the employment in question." Id., 401 U.S. at 432, 91 S.Ct. at 854.

The record in this case amply evidences the kind of situation that can develop when a large employer relies upon subjective criteria and utilizes employment procedures which have no business necessity. The record in the instant case demonstrates that Detroit Edison has an all white management and a nearly all-white supervisory workforce. The record further demonstrates the management is represented in its dealings with defendant unions only by whites and, with the exception of plaintiff Willie Stamps, the unions are represented only by whites.

This Court certainly has the authority to grant relief in a case such as this where there is racial discrimination in employment based on the use of subjective criteria. The Sixth Circuit Court of Appeals in United States v. IBEW, Local 38, 428 F.2d 144 (1970), cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970), has indicated that district courts may utilize broad affirmative relief under Title VII to enjoin the "continuation of effects of past discrimination resulting from present practices (neutral on their face) which have the practical effect of continuing past injustices." Id. at 149. The Sixth Circuit in *Local 38* indicated that one

such practice—present in the instant case as well—is the "administration of qualification examinations which had no objective standards and which produced unexplained discriminatory results." Id. at 150.

The defendant Detroit Edison discriminates in numerous ways in addition to its utilization of subjective criteria. The Governments' exhibits clearly demonstrate that preference in both hiring and assignment to desirable departments is given to the friends and relatives of incumbent employees. This results from the fact that a substantial number of applicants who are hired are notified of job opportunities in the Company or particular departments by friends or relatives; Company witnesses admitted that employees were hired into high opportunity jobs and departments by word of mouth. The courts have regarded such neutral practices as unlawful where engaged in within the context of past discrimination; and word of mouth hiring is to be condemned when it produces such results as it does in this case. See, e. g. Parham v. Southwestern Bell Telephone Co., supra; Heat & Frost Insulators v. Vogler, 407 F.2d 1047 (5th Cir. 1969). As noted by the court in United States v. Carpenters Local 169, 457 F.2d 210, 215 n. 8 (7th Cir. 1972), where defendant "opens its doors to a token number of blacks, nepotism applied evenly tends to solidify the miniscule percentage of blacks."

There is also much testimony in the record by numerous individuals as to individual acts of intentional discrimination and such testimony was not rebutted in any way by the defendants. The amount of evidence indicating intentional discrimination is surprising because intentional discrimination is usually difficult to demonstrate; proof of "overt racial discrimination in employment is seldom direct." Brown v. Gaston County Dyeing Machine Company, supra, 457 F.2d, at 1382. The weight of the evidence presented by the testimony of blacks indicating that they possessed work experience and qualifications for the jobs for which they applied but were rejected, constitutes a *prima facie* violation of the law—inasmuch as no attempt was ever made by the defendants to introduce any evidence showing that the witnesses' testimony was incorrect or incomplete or that white employees with superior or equal qualifications were chosen (or that black employees were chosen for such jobs). Since no rebuttal evidence was offered, the testimony of the individually named private plaintiffs and other blacks who testified stands uncontradicted, and the allegations of discrimination must be sustained under the standards established by the Supreme Court for nonclass individual discrimination cases in McDonnell Douglas Corp. v. Green, 5 FEP Cases 966 (May 14, 1973). The Court in *Green* stated that once the employer decided to seek someone with the respondent's qualifications, the burden then shifts to the employer to articulate some non-discriminatory reason for respondent's rejection. Id. at 970. It should be noted that the intentional or deliberate discrimination demonstrated by this record is not necessary for a violation and the ordering of relief under Title VII. That such discrimination has occurred, and, in some instances, continues to occur subsequent to the filing of the charges in this case, demonstrates how flagrant has been, and continues to be, Defendant Detroit Edison's violation of the law.

The evidence in this case shows that blacks have been damaged by both of the collective bargaining agreements negotiated by Detroit Edison Company, the effect of which is to give preference for job bidding inside all the predominantly white departments to the employees in such departments and job classification. Since blacks have not been hired into such jobs and departments as Construction and Maintenance, Transmission and Distribution Overhead and Underground Departments, the effect is to make it impossible or extremely unlikely that blacks will have an opportunity to be considered for promotion at all. This makes the instant case much more se-

vere in terms of limiting black promotion opportunities than the leading and traditional seniority cases like Quarles v. Philip Morris Inc., 279 F.Supp. 505 (E. P.Va., 1969) and Local 189 United Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969) cert. den., 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100 (1970). Those cases dealt with fact situations where defendant unions and companies were willing to permit unimpeded transfer rights for black employees who had been hired into low level jobs—the disputes concerned simply union and company insistence upon the denial of seniority credits to blacks and the refusal to preserve their wage rate upon transfer. Here there is much more than that. For in this case, the effect of the collective bargaining agreement is not only to deprive incumbent black employees of seniority credits which they have accumulated in previously segregated jobs, but also to completely preclude the opportunity to transfer by bidding procedures which provide preference for incumbents and in most instances, no notice of job opportunity for employees in other departments. See Bing v. Roadway Express, Inc., 444 F.2d 687 (5th Cir. 1971); Witherspoon v. Mercury Freight Lines, 457 F.2d 496 (5th Cir. 1972). Belt v. Johnson Motor Lines, Inc., 458 F.2d 443 (5th Cir. 1972); Jones v. Lee Way Motor Freight Co., supra; United States v. St. Louis-San Francisco Ry. Co., supra, and United States v. Jacksonville Terminal, supra.

Additionally, it is clear that if a black incumbent is fortunate enough to have the opportunity to bid on the all white skilled trades jobs and to surmount the considerable obstacles involved in bidding successfully, the employee must give up seniority credits previously accumulated in the job or department to which he has been consigned. Since the black employees locked into low opportunity jobs at Detroit Edison until sometime subsequent to July 2, 1965, were discriminated against in hiring by being consigned to certain jobs, loss of seniority credits when transferred to the all white skilled trades departments penalizes black employees and discourages them from applying by depriving them of competitive status seniority credits which would have been theirs had it not been for the hiring discrimination which existed in the first instance. This is to say, had there been no discriminatory hiring policy which relegated blacks to the low opportunity jobs, black employees would be fairly represented throughout Edison, having been given an equal opportunity in the first instance, in other departments. Once hiring discrimination is in evidence as is reflected from the record and testimony in this case, a seniority system which discourages and makes unlikely a transfer for blacks is unlawful.

As stated by Judge George Edwards for an unanimous court in Bailey v. American Tobacco Co., 4 FEP Cases 916 (6th Cir. 1972):

"It is clear that a present non-discriminatory seniority provisions, which has no race discrimination features on its face, may nonetheless be a violation of the Equal Employment Opportunities Act if it serves to preserve the long-standing effect of past discrimination." Id. at 917.

"When an employer or union has discriminated in the past and when its present policies renew or exaggerate discriminatory effects, these policies must yield, unless there is an overriding legitimate, non-racial purpose." Local 189 United Papermakers v. United States, 416 F.2d 980, 989 (5th Cir. 1969) cert. den., 397 U.S. 919, 90 S.Ct. 926, 25 L. Ed.2d 100 (1970). See also United States v. IBEW, Local 38, 428 F.2d 144 (6th Cir. 1970) cert. denied, 400 U.S. 943, 91 S.Ct. 245, 27 L.Ed.2d 248 (1970); EEOC v. Plumber, Local 189, 438 F.2d 408 (6th Cir. 1971) cert. denied, 404 U.S. 832, 92 S.Ct. 77, 30 L.Ed. 2d 62 (1971); United States v. Roadway Express, Inc., 4 FEP Cases 643 (6th Cir. 1972).

Plaintiffs have contended throughout the proceeding in this case that the written tests utilized by Detroit Edison Company violates Title VII and does not meet the standards of Griggs v. Duke Power Co., supra and the Equal Employment Opportunity Guidelines. It is indisputable that Detroit Edison had used its written examinations to "freeze the status quo" of past discrimination and that such has resulted in a differential impact upon the races. By demonstrating a "freezing" of the *status quo* and a differential impact upon the races, plaintiffs have met the burden imposed by *Griggs*. However, the defendant Detroit Edison has come forth with no written reports as required by EEOC Guidelines to substantiate the unsupported assertion of its employed psychologist that written examinations at Edison have been validated. (It should be noted that *Griggs* approved of the EEOC Guidelines.) The written examinations are unsatisfactory with regard to differential validity as well as other areas. See EEOC Guidelines 35 C.R.R. § 1967.5(b). See also U. S. v. Georgia Power Co., 6 FEP Cases 587 (5th Cir. 1973); United States v. Jacksonville Terminal Co., 451 F.2d 418, 456 (5th Cir. 1971); Moody v. Albemarle Paper Co., 5 FEP Cases 613 (4th Cir. 1973); Robinson v. Lorillard Corp., 444 F.2d 791, 798 n. 7 (4th Cir. 1971). See generally, Cooper and Sobel, "Seniority and Testing Under Fair Employment Laws; A General Approach to Objective Criteria of Hiring and Promotion," 82 Harv. L.Rev. 1598 (1959); Comment, "Employment Testing; The Aftermath of Griggs v. Duke Power Co.," 72 Colum. L.Rev. 900 (1972).

Although the National Labor Relations Act is applicable in cases of this kind to the unions conduct in the area of racial discrimination in employment, the Taft-Hartley Act makes the employers liable as well for the conduct engaged in this case. Both unions have violated the National Labor Relations Act by failing to represent fairly all employees within the bargaining unit.

Steele v. Louisville & National Ry. Co., 323 U.S. 192, 65 S.Ct. 226, 89 L.Ed. 173 (1944). The practices of Local 223 are comparable to those described in *Steele* that they involve intentional as well as unintentional discrimination; the refusal to process grievances of blacks, the negotiation of discriminatory seniority provisions, the failure to accord black meter readers the rights that whites had, the gerrymandering of seniority districts, and the exclusions of blacks from political office all contribute a pattern that make this case similar to *Steele*. Both Local 223 and Local 17 are liable for their negotiation of discriminatory seniority provisions and for acquiescence in racial discrimination. The unions have failed in their obligation under the National Labor Relations Act and Title VII to protest racially discriminatory employer hiring practices which interfere with the right of black applicants or black employees outside of the union's own bargaining unit to be hired or to be promoted. An obligation is imposed on Local 223 and Local 17 to raise the subject matter of racial discrimination in hiring under the National Labor Relations Act as part of the duty of fair representation doctrine as well as under Title VII.

In light of the foregoing legal authority findings of fact, it is obvious that the defendants have violated Title VII of the Civil Rights Act of 1964 and the National Labor Relations Act, as well as Section 1981 of the Civil Rights Act of 1968, which provides that all persons within the jurisdiction of the United States shall have the same right to make and enforce contract.

## VI. CONCLUSIONS OF LAW

1. This Court has jurisdiction of this action under Section 707(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6(b).

2. The Attorney General of the United States is authorized to institute this action on behalf of the United States under Section 707(b) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-6(b) to

obtain relief from a pattern or practice of resistance on the part of the defendants to the full enjoyment of the rights to equal employment opportunity secured by Title VII of that Act.

3. Defendant Detroit Edison Company is an employer within the meaning of 42 U.S.C.A. § 2000e(b) and is engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(h).

4. Defendant Unions are labor organizations within the meaning of 42 U.S.C. § 2000e(d) and are engaged in an industry affecting commerce within the meaning of 42 U.S.C. § 2000e(h).

A. *Unlawful Assignment Discrimination*

■ 5. Defendant Detroit Edison's practice of failing to consider blacks for its high opportunity jobs, while assigning them to the low opportunity jobs of: building cleaner, lamp changer, janitor, elevator operator, wall washer and serviceman in the Buildings and Properties Department; plant cleaner and coal and ash handler—Central Heating in the Production Department, and any job in the Stores and Transportation Department except for the jobs in the auto mechanic group, while at the same time assigning large numbers of white employees who are not better qualified to highly paid, high opportunity jobs and lines of progression, is an unlawful employment practice in that it classifies and segregates these employees in such a way that they are deprived of equal employment opportunities in violation of Section 703(a)(2) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–2a(2). Local 189, United Papermakers v. United States, 416 F.2d 980 (5th Cir. 1969), cert. denied, 397 U.S. 919, 90 S.Ct. 926, 25 L.Ed.2d 100; Clark v. American Marine Corp., 304 F.Supp. 603 (E.D.La., 1969), aff'd per curiam, 437 F.2d 959 (5th Cir., 1971).

6. Statistical evidence is sufficient to establish a prima facie case of racial discrimination in job assignments. United States v. Chesapeake & Ohio Railway Co., 471 F.2d 582 (4th Cir.

1972); United States v. Hayes International Corp., 456 F.2d 112 (5th Cir. 1972); United States v. Ironworkers Local 86, 443 F.2d 544 (9th Cir. 1971); Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970).

■ 7. The fact that some whites as well as blacks were assigned to some of the low opportunity jobs to which blacks were assigned does not overcome the inference that blacks were assigned to those jobs because of their race. Jones v. Lee Way Motor Freight, Inc., 431 F.2d 245 (10th Cir. 1970), cert. denied, 401 U.S. 954, 91 S.Ct. 972, 28 L. Ed.2d 237 (1971); United States v. Bethlehem Steel, 312 F.Supp. 977 (W.D. N.Y., 1970) reversed in part on other grounds, 446 F.2d 652 (2nd Cir. 1971).

■ 8. The systems of job posting and seniority established by Edison's General Order 203 and by its collective bargaining agreements with Local 17 and Local 223, grant preference to whites already employed in high opportunity occupational groups, bargaining units and departments over blacks assigned to low opportunity jobs who seek to transfer to high opportunity jobs. The seniority systems also penalize blacks who transfer by denying them credit for time spent in their former occupation groups, bargaining units and departments. Such posting and seniority systems, although racially neutral on their face, are unlawful in that they perpetuate the effects of past discrimination in assignment. Bailey v. American Tobacco Co., 462 F.2d 160 (6th Cir. 1972); Local 189 v. United States, *supra*; Quarles v. Phillip Morris, Inc., 279 F.Supp. 505 (E.D.Va., 1968); United States v. Bethlehem Steel, 446 F.2d 652 (2nd Cir. 1971); United States v. N. L. Industries, 479 F.2d 354 (8th Cir. 1973); Bowe v. Colgate Palmolive Co., 416 F.2d 711, 712 (7th Cir. 1969).

■ 9. Each defendant, subsequent to the passage of the Civil Rights Act of 1964, has negotiated and executed collective bargaining agreements which provide for an occupational group and bar-

gaining unit seniority system and has contributed to the continuation and operation of the system, and has therefore intentionally engaged in unlawful employment practices within the meaning of Section 707(a) of the Civil Rights Act of 1964, 42 U.S.C. § 2000e–6(a). Local 189 v. United States, *supra*; Robinson v. P. Lorillard, 444 F.2d 791 (4th Cir. 1971).

10. The job posting and seniority systems in effect at Edison are unlawful despite the fact that they may not have been a total deterrent to blacks' attempts to transfer and some blacks have overcome their disadvantages to progress from low opportunity occupation groups and departments. United States v. Bethlehem Steel Corp., 446 F. 2d 652 (2d Cir. 1971).

## B. *Unlawful Hiring Discrimination*

11. Where Edison's work force is 92 percent white and qualified blacks are available in the relevant labor market in far greater proportion, its reliance on friends and relatives of incumbent employees as its principal recruiting source for much of its hiring and for a majority of hourly paid positions and its preference for them over other applicants is a failure to hire and a limiting of applicants for employment which adversely affects their opportunities because of their race in violation of Section 703(a)(1) and (2) of Title VII, 42 U.S.C. § 2000e–2(a)(1) and (2). United States v. Chesapeake & Ohio Railway, *supra*; Local 53 Asbestos Workers v. Vogler, 407 F.2d 1047 (5th Cir. 1969). Parham v. Southwestern Bell Telephone Co., 433 F.2d 421 (8th Cir. 1970).

12. In light of Edison's practice of friends and relatives recruiting, its failure to advertise job opportunities generally, and its reputation of excluding blacks, Edison cannot claim a lack of black applicants as a defense for its failure to hire them. United States v. Sheet Metal Workers Local 36, 416 F.2d 123 (8th Cir. 1970); Jones v. Lee Way Motor Freight, *supra*; Cypress v. New-

port News General and Non-Sectarian Hospital, 375 F.2d 648 (4th Cir. 1967).

13. Where few blacks are hired overall and none have been hired in some departments and ultimate hiring authority is left with white supervisors, it must be inferred that these supervisors have resisted the hiring of blacks for reasons of race, and the continuation of this practice is unlawful. Rowe v. General Motors, 457 F.2d 348 (5th Cir. 1972).

## C. *Unlawful Testing Practices*

14. Because the following test batteries: mechanical placement, clerical placement, cable splicer, apprentice lineman, meter reader, substation operator, assistant power plant operator, customer serviceman, and the Henry Ford Community College entrance examination, used by Edison in selecting among applicants for hire or for transfer, are demonstrated to have the effect of screening out greater proportions of black applicants than of white applicants, it becomes Edison's burden to prove that these test batteries are valid predictors of job performance, for blacks as a separate group where feasible, and that the cut off scores or selection standards applied are related to a level of proficiency reasonably to be expected of employees on the job. Guidelines on Employee Selection Procedures, 29 C.F.R. 1607.3, 1607.5, 1607.6; Griggs v. Duke Power Co., 401 U.S. 424, 91 S.Ct. 849, 28 L.Ed. 2d 158 (1971); United States v. Georgia Power Co., 474 F.2d 906 (5th Cir. 1973); Moody v. Albemarle Paper Co., 474 F.2d 134 (4th Cir. 1973); United States v. Jacksonville Terminal, 451 F.2d 418 (5th Cir., certiorari denied, 406 U.S. 906, 92 S.Ct. 1607, 31 L.Ed.2d 815).

15. The level of "validity" as predictor of job performance which a test must have should be demonstrated by evidence of a correlation between a significant sample of employees' test scores and their ratings on a measurement of an important criterion of job success which correlation can be demon-

strated to have both statistical significance at the 5 percent level and practical significance. Guidelines, 29 C.F.R. 1607.5(c)(1) and (2). United States v. Georgia Power Co., *supra*.

16. Any demonstration of validity should include the presentation of written results of a validation study including graphical and statistical information and objective descriptions of the procedures followed and reasonably complete reporting of the data on which the study is performed and how it was gathered. Guidelines 29 C.F.R. 1607.6. In addition any validation study, in order to be probative, must compare performance criteria ratings with test results as they are actually used rather than with test results evaluated by a hypothetical model. United States v. Georgia Power Co., *supra*.

17. Unless a test can be demonstrated to have an extraordinarily high relationship to job performance, reasonable cut-off scores should eliminate only those applicants who are likely to be unable to perform sufficiently well on the job to be consistent with the necessities of safety and efficiency. Guidelines, 29 C.F.R. 1607.6; Griggs v. Duke Power Co., *supra*.

18. None of the test batteries which were demonstrated to have the effect of screening out higher percentages of blacks than of whites, with the exception of the customer serviceman's battery, were proved to be valid predictors of job performance in accordance with the Guidelines, *supra*, by means of probative evidence, including written reports of validation studies, showing statistically and practically significant relationships between job performance and test scores as they are actually used. The continued use of these test batteries without such proof of validity is unlawful. Griggs v. Duke Power Co., *supra*; United States v. Georgia Power Co., *supra*; Moody v. Albemarle Paper Co., *supra*.

19. None of the test batteries here in issue were demonstrated to be administered with cut-off scores which are reasonable in that they screen out only those applicants likely to possess insufficient ability to perform on the job. On the contrary, in the case of each of these test batteries the cut-off scores were demonstrated to be so high as to reject applicants whose scores are equal to the scores of employees who have been sufficiently able to perform in the past. The continued use of these test batteries, even if demonstrated to be valid predictors of job success, without adjusting their cut-off scores to a more reasonable level is unlawful. Griggs v. Duke Power Co., *supra*.

20. In the three job areas, general mechanical occupations, general clerical occupations, and the power plant operator group, where sufficient numbers of blacks are employed to make differential validity studies technically feasible, Edison attempted such differential studies but failed to establish differential validity because the studies were insufficient to establish validity in general. In those areas where insufficient numbers of blacks are employed to make differential validity feasible, Edison's unlawful practices of racial exclusion are the cause of this absence of sufficient number of black employees. This lack of differential validation is an additional reason why the continued use of these test batteries as selection devices is unlawful. Guidelines, 29 C.F.R. 1607.-5(b)(5); United States v. Jacksonville Terminal Co., *supra*.

D. *Necessary and Appropriate Relief.*

21. Where an employer and labor organizations have to have engaged in unlawful employment practices under Title VII, the courts have the authority and duty to enter a decree which not only prevents future discrimination, but which also corrects insofar as feasible the effects of past discrimination. Local 53, Asbestos Workers v. Vogler, *supra*; United States v. Carpenters Local 169, 457 F.2d 210 (7th Cir., 1972), cert. denied, 409 U.S. 851, 93 S.Ct. 63, 34 L. Ed.2d 94 (1972); United States v. Iron-

workers Local 86, 315 F.Supp. 1202 (W. D.Wash.1970). See also, Louisiana v. United States, 380 U.S. 145, 154, 85 S. Ct. 817, 13 L.Ed.2d 709.

■■ 22. Where an unlawful system of promotion and transfer based on occupational group and bargaining unit job posting and seniority exists, members of the affected class of blacks who were assigned to low priority jobs because of their race should be provided an opportunity to bid on the high opportunity jobs from which they have been excluded, on the basis of total length of service with the Company and without loss of pay where they are successful. Local 189 v. United States, *supra*, Long v. Georgia Kraft, 450 F.2d 557 (5th Cir. 1971).

■■ 23. Having found a pattern of discriminatory exclusion in hiring and assignments, this Court has wide discretion in ordering such affirmative action, including the accelerated hiring and assignment of blacks in an effort to meet goals established for the purpose of overcoming the past patterns of racial exclusion. United States v. Local 212 International Brotherhood of Electrical Workers, 472 F.2d 634 (6th Cir. 1973); Southern Illinois Builders Association v. Ogilvie, 471 F.2d 680 (7th Cir. 1972).

24. Where tests have been found to have a discriminatory impact and to be without proper validation and justification for the level of their cut-off scores or standards, their continued use must be prohibited. Moody v. Albemarle Paper Co., *supra*. Such a prohibition may allow resumption of testing as a selection device when the following conditions are met. The tests must be properly demonstrated to be valid predictors of job performance. Differential validity must also be accomplished where this is feasible, as it is here in the case of the mechanical and clerical placement batteries and the assistant power plant operators' battery because sufficient numbers of blacks are found in these occupations. Where differential validity is not technically feasible, but the lack of sufficient numbers of black employees

for this purpose is due to the Company's unlawful practices, reasonable steps, including the lowering of cut-off scores, must be taken to permit sufficient numbers of blacks to gain access to the occupation group so that differential validity may be established. This requirement applies as well to such cases as that of the customer servicemen's battery where validity for a general population group has been established. Where cut-off scores are unreasonably high they should be adjusted so that they screen out only those who may reasonably be expected to be unsatisfactory employees in relation to the proficiency required to perform the job and not measured merely in comparison to other employees. Griggs v. Duke Power Co., *supra*; United States v. Jacksonville Terminal Co., *supra*; United States v. Georgia Power Co., *supra*; Moody v. Albemarle Paper Co., *supra*.

■■■ 25. Where, because of discrimination, black employees and rejected applicants have lost employment opportunities which would have allowed them to earn more than they have earned, it is appropriate to award them amounts of back pay sufficient to restore them to the economic position in which they would have been but for this discrimination. Robinson v. Lorillard, *supra*. It is also appropriate for such an award to be made in pattern and practice suits brought by the Attorney General and involving classes of victims of discrimination, United States v. Georgia Power Co., *supra*, and for the actual amounts to be awarded to individual recipients to be determined by an ancillary proceeding. Bowe v. Colgate-Palmolive, *supra*.

■■ 26. The Court may allow private plaintiffs reasonable attorneys' fees as part of costs. 42 U.S.C. § 2000e–5(k).

27. The Court may assess punitive damages. Cf. 42 U.S.C. 1983; Lee v. Southern Home Sites Corp., 429 F.2d 290 (C.A. 5, 1970); Chubbs v. City of New York, 324 F.Supp. 1183 (D.C.S.D. N.Y., 1971).

## ORDER

Private plaintiffs are authorized under the Civil Rights Act of 1964 to bring an action on behalf of themselves and all other persons similarly situated pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure. The United States is also a proper party plaintiff. The members of the class represented by the plaintiffs are all black citizens whom defendant Detroit Edison Company has refused to hire and has discharged from employment, discriminated against with respect to compensation, terms, conditions and/or terms of employment; and/or otherwise segregated, classified, or otherwise deprived them of employment opportunities because of their race or color.

Defendants Detroit Edison Company, Local 223, Utility Workers Union of America and Local 17, International Brotherhood of Electrical Workers of America, have, prior and subsequent to July 2, 1965, discriminated against blacks, including plaintiffs and members of their class with respect to employment, compensation, terms and conditions of employment due to race, and/or color through the utilization of hiring practices, tests, standards and procedures which deny plaintiffs their statutory rights under all statutes noted above. As a result of the aforementioned discriminatory practices, defendant Detroit Edison Company is under an affirmative obligation to employ and promote substantial numbers of black workers. Defendants Local 223 and Local 17 are under an obligation to represent their black members, black applicants and black employees in and outside their bargaining units fairly.

Therefore, it is hereby ordered, adjudged and decreed, as follows:

1. The defendants and their officers, agents, employees, successors, and interests, and all persons in active concert with participation with them are permanently enjoined from engaging in any act or practice which has the purpose or effect of discriminating against any individual because of his race or color, and specifically from (a) refusing to hire or failing to hire, promote, upgrade, train or assign any individual discharging any individual, otherwise discriminating against any individual as an employee or applicant for employment with respect to his compensation, terms, conditions or privileges of employment because of such individual's race or color; (b) limiting, segregating or classifying the employees of the Company in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee because of such individual's race or color and (c) discriminating or retaliating in any manner against any employee or applicant who has furnished information or participate in any respect in the investigation of the Company's employment practices in connection with these actions.

2. The affected class for the purposes of the hiring and transfer provisions of this decree shall be deemed to consist of all black individuals who applied for employment with defendant Detroit Edison Company subsequent to July 2, 1965, and were rejected and black employees who would have applied but for defendant's discriminatory hiring policy and/or black employees who were hired prior to the date of the decree and who were actively employed at any time after July 2, 1965, and who were at any time regular employees in the job classifications referred to above as low opportunity jobs.

3. All members of the affected class who were refused hire or who would have been refused hire at Detroit Edison Company between July 2, 1965, and the date of the decree shall be put on notice through newspaper and radio advertisements in the black media (which shall include but not be limited to the *Michigan Chronicle* and 1 black radio station and 1 black television station), the *Detroit News* and/or the *Detroit Free Press* regarding the content of this decree. Such notices shall run for at least 60 days. Within 60 days after the last day of such notice all black individuals who (1) have been rejected on the basis

of race, and (2) attended a vocational school in the Detroit area and took courses in mathematics, science or similar courses and who would have applied to Edison but for defendant's discriminatory hiring policy, shall sign a register at the Company's employment offices or at another appropriate location. Such individuals shall receive notice of and receive first opportunity to apply for vacancies in high opportunity jobs designated in this decree for the duration of this decree. Applications shall be considered in the chronological order in which the applicant has signed the register. Such individuals shall also be part of the affected class for the purposes of the back pay provisions set forth below as well as those provisions relating to notification of vacancies, bidding and seniority credits. Such individuals' seniority which is to be utilized for the purpose of the transfer provisions of this decree shall be computed from the date that the applicant was rejected because of race or the date that such individuals identified above in category 2 would have applied but for defendant's discriminatory hiring policy.

4. All members of the affected class shall have an opportunity to transfer to jobs in departments other than those to which they are presently assigned by bidding on such jobs when vacancies occur and are posted for bid.

At each location and in each department where a member of the affected class is employed, the Company shall post vacancies for all jobs in all departments at least 20 days before such vacancies are to be filled. The Company shall also establish a procedure by which it shall receive bids for posted jobs in writing. No affected class member shall be required to hold a labor or helper job which does not provide training for craft jobs in a line of progression as a condition of progress into such a line of progression.

A member of the affected class may effectuate a single transfer with carry-over seniority rights and earnings retention to a new department within five years after the effective date of this de-

cree unless the period is extended by the court. In the event that an affected class member who transfers chooses to return to his former department, or fails to perform the duties of his new department, within 90 days after his transfer, he may return to his former department without loss of seniority or benefits. Such an affected class member who returns to his former department as a result of disqualification may effectuate two additional transfers to new departments without loss of carry-over seniority and rate retention as if it were his first transfer under the terms of this decree. In the event that an applicant fails to perform his duties, such applicant shall be given the opportunity to transfer to another job with the same future transfer rights provided employees in this decree. In such an event, the Company shall file with the Court a report within 15 days after the employee's disqualification, setting forth the training opportunities afforded the employee and the reasons for his disqualification in specific factual terms.

5. All members of the affected class shall be credited with their Company seniority as if it were that department or unit seniority in the department or unit to which they transfer pursuant to this decree or in departments or units to which they previously transferred.

6. At no time shall a member of the affected class who is transferred under this decree be paid a lower rate than the rate for the job for which he transferred.

7. Defendants shall pay each of the members of the affected class an amount equal to the average earnings of skilled trades high opportunity jobs referred to above since July 2, 1965, less the amount each member of the affected class actually earned during that period up to the date of this decree. From the date of this decree defendants shall pay each member of the affected class an amount equal to the average present earnings of said high opportunity skilled trades jobs until the time at which the employee effectuates a transfer to a high opportunity job consistent with the provisions

noted above. The amount of pay provided subsequent to the decree shall not be lower than the affected class member's earnings and the amount that he should make in the future according to his pay progression that he is under at the time of the decree. Such amount of pay at the skilled trades pay rate shall be computed for pay grade progression purposes according to the number of years that a member of the affected class has been employed in a low opportunity job or in the case of the rejected applicant excluded from employment altogether from that date of his rejection provided, however, that in the case of the rejected applicant his time shall be computed subsequent to July 2, 1965.

8. Subsequent to the time of the transfer to a high opportunity job, said member of the affected class shall receive a rate of pay for the job to which he has successfully bid or the rate of pay previously received whichever is the higher and shall receive future increases in said classification as if he had been in the classification from the date of the decree. If such a member of the affected class refuses 3 transfer opportunities to high opportunity jobs or is unable to perform his duties on 2 jobs after 2 transfers, he shall revert to his former rate of pay, i. e., the pay progression rate that he was on and would be on in the absence of this decree.

9. Subject to the availability of qualified applicants, the Company shall recruit and endeavor to hire black applicants for all positions within the Company on an accelerated basis with the goal of having a number of blacks employed by the Company at 30% of its total work force.[4]

10. In order to insure that the Company's policy of non-discriminatory hiring is communicated to minority groups, the Company shall establish contacts with high schools, technical and vocational schools and organizations which specialize in minority employment in the Detroit area and inform them of the employment opportunities available at Detroit Edison and of the Company's non-discriminatory hiring policy. In addition, whenever the number of black applicants among all applicants being considered for employment is less than 50%, the Company shall advertise opportunities in mass media which are directed primarily to the black community.

11. Subject to the availability of applicants, the Company shall be recruiting and hiring black applicants or by the promoting and transferring of black employees fill all future vacancies which are filled from outside the Company or inside the Company in the jobs listed below on the basis of three blacks for every two whites until 25% of the employees in each of these jobs and lines of progression are black:

### Production Department

| | |
|---|---|
| power plant operator | general mechanic |
| fireman | industrial operator |
| equipment operator | instrument man |

### Construction Department

| | |
|---|---|
| brickmason | bridgeman |
| sheetmetal worker | painter |
| shop electrician | welder |
| shop machinist | rigger |
| mechanic fitter | carpenter |
| electrician | pipecoverer |

### Transmission and Distribution

| | |
|---|---|
| lineman | cable splicer |

### Marketing Department

| | |
|---|---|
| appliance repairman | customer serviceman |

### Meter Department

meter tester

### Electrical Systems-Substation

| | |
|---|---|
| operator | journeyman electrical maintenance |

### Transportation Department

auto mechanic

### Meter Reading

meter reader

12. The Company shall promote from amongst its senior black employees one black employee as foreman or supervisor

---

4. Taking into consideration the percentage of blacks in the City of Detroit (44 percent) and the percentage of blacks available in the labor force of the City of Detroit (41.3 percent) and the Standard Metropolitan Statistical Area (17 percent) and the proportion of blacks among the skilled unemployed in the City of Detroit (47 percent) and the concentration of Edison's work force in the City of Detroit (50%), a goal of 30 percent black employment at Edison is reasonable.

for every one white employee who is promoted to supervisor.

13. The Company shall not administer for the purposes of hiring and promotion or transfer any general intelligence or aptitude test for black employees or applicants that is not validated in accordance with the EEOC's Guidelines on Employee Selection Procedures 29 C.R.R. §§ 1067.1 to 1607.14.

14. Defendants shall provide immediate promotion to a job which has a pay rate equivalent and responsibilities equivalent to a supervisory position to Mr. James Atkinson.

15. Defendant Local 223 Utility Workers of America shall refrain from retaliating against plaintiff Willie Stamps for his efforts to obtain equal rights for black workers and applicants and shall refrain from interfering in any way with the full enjoyment of his rights as Chairman of the Property and Right of Way Division in Local 223 Utility Workers Union of America. Defendant Local 223 shall affirmatively take steps to assure that Stamps serves his full term as Chairman as he was elected to do in December 1972.

16. A committee will be established which will report to the Court on a bi-monthly basis for the duration of this decree which shall be six years. The committee shall be composed of representatives of defendants, the Association for the Betterment of Black Edison Employees and the Justice Department and a chairman to be appointed by the court. The chairman shall be the Director of the Detroit office of Equal Employment Opportunity Commission. If the Director of the Detroit office of the Equal Employment Opportunity Commission is unwilling or unable to serve, the Court shall appoint another chairman. The purpose of said committee will be to resolve differences and disputes that may arise under this decree. Whenever any issue arises that cannot be resolved by this committee, any party shall have the right immediately to refer said issue to the Court or the Court's designate for disposition.

17. Within thirty days after April 1 and October 1 of each year for the six years following the entry of this decree, the Company shall report to the Court and plaintiffs the following information:

A. A printout showing all employees grouped by department and by job code within each department indicated for each employee; name, race, department, job pay rate and hire date and a summary showing the total number of employees by race in each department and each in job classification within each department. The Company shall retain all job posting notices and bidding records for a period of at least two years and shall provide a record of all posting, on which members of the affected class have bid including the date of the posting, the job posted, the employees who bid, the successful bidder and the date the job was awarded.

B. A list of all schools and organizations contacted by the Company in recruiting minority applicants, the nature of the contract and the number of applicants referred by each.

C. A breakdown of the Company's applicant flow by race which indicates the number of applicants hired, pending and rejected. For all active pending minority applicants, such breakdown shall indicate the number of minority applicants who are to be considered for each job classification.

D. A breakdown of all new hires indicating name, race and job classification.

E. The number of employees by race currently employed in the craft jobs described above, indicating the number employed as apprentices or helpers and as journeyman.

F. The defendants shall make all records and documents relevant to

124

the provisions of this decree available to private plaintiffs, the Department of Justice, and the Association for the Betterment of Black Edison Employees, for copying at defendant's offices in Detroit, Michigan.

18. Defendants shall pay to private plaintiffs reasonable attorneys' fees.

■ 19. Defendants Detroit Edison Company and Local 223 shall pay plaintiffs punitive damages. Since those defendants have been extremely obdurate and intransigent in their determination to implement and perpetuate racial discrimination in employment at Detroit, Edison, the awarding of punitive damages is appropriate and necessary. The trial record indicates that these two defendants repeatedly and callously disregarded or rejected the numerous appeals of blacks who asked that Edison's hiring and promotion practices be reformed and that blacks be afforded fair representation by the unions. It is both commendable and remarkable that black workers at Detroit Edison so long persisted in seeking justice by means of persuasion—in the face of the defendants' unwillingness to respond to reasonable expressions of concern by black workers—before resorting to this law suit. When a defendant's behavior is so extremely unreasonable and violative of the law as has been the behavior of two of the defendants in this case, one can only infer that the defendants have acted with malice. Therefore, this Court hereby orders defendant Detroit Edison Company to forthwith pay plaintiffs, including both those individually named as plaintiffs and those comprising the class represented by the named plaintiffs but excluding the United States, Four Million Dollars ($4,000,000.00). This Court hereby orders defendant Local 223 to forthwith pay plaintiffs, including both those individually named as plaintiffs and those comprising the class represented by the named plaintiffs but excluding the United States, Two Hundred Fifty Thousand Dollars ($250,000.00).

The Court finds that although Local 17 has engaged in racial discrimination against blacks at Detroit Edison in its collective bargaining agreement, it has not acted with the requisite malice of the Company or Local 223; this Court will therefore not award punitive damages against Local 17. The punitive damages awarded in this case shall be paid to the Clerk of the U. S. District Court, and this Court shall issue a subsequent Order providing for the manner in which the money is to be disbursed to plaintiffs.

This Court will maintain jurisdiction for the purpose of ordering such additional relief as seems appropriate and necessary.

It is so ordered.